[Civ. Nos. 21021, 21029. Third Dist. July 27, 1982.]

RICKY ORTEGA et al., Petitioners, v.
THE SUPERIOR COURT OF SAN JOAQUIN COUNTY,
Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Robert N. Chargin, Public Defender, Jeffrey Wellerstein, Deputy Public Defender, Talley, Holloway, Tauman & Holmes and Craig M. Holmes for Petitioners.

No appearance for Respondent.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Roger E. Venturi and Edmund D. McMurray, Deputy Attorneys General, for Real Party in Interest.

OPINION

BLEASE, J.—Petitioners, Ricky Ortega and Michael Angelo Morales, face trial on charges of robbery, rape, murder with special circumstances, and conspiracy to murder. Each contends he has been improperly held to answer these charges on the grounds the magistrate permitted unauthorized persons to attend the preliminary examination and that the evidence against them was the product of an unlawful arrest. Morales makes the additional contentions that insufficient evidence was adduced at the examination to support the charges of robbery and conspiracy to murder and the allegations of special circumstances of torture (Pen. Code, § 190.2, subd. (a)(18)), atrociousness (Pen. Code, § 190.2, subd. (a)(14))[1] and lying in wait (Pen. Code, § 190.2, subd. (a)(15)). We issued the alternative writ of prohibition to review these contentions. (See, e.g., *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941]; *Bielicki v. Superior Court* (1962) 57 Cal.2d 602 [21 Cal.Rptr. 552, 371 P.2d 288]; *Greenberg v. Superior Court* (1942) 19 Cal.2d 319 [121 P.2d 713].)

FACTS

On January 9, 1981, Sergeant Andrew Jackson of the Stockton Police Department was assigned to investigate the disappearance of Terri

---

[1] The evidentiary contention regarding this special circumstance is rendered moot by the intervening decision of the California Supreme Court holding it is unconstitutionally vague. (*People v. Superior Court (Engert)* (1982) 31 Cal.3d 797 [183 Cal.Rptr. 800, 647 P.2d 76].) Accordingly, we do not address it.

Winchell. A missing person report had been filed after she failed to come home the previous evening. Her car was found locked and unattended at Weberstown Mall.

Sergeant Jackson interviewed Terri's mother at her home. She informed him it was "totally unlike" Terri not to have called to tell her where she was. While at the house Sergeant Jackson also interviewed Glenda Chavez. Glenda informed him Terri had telephoned her the previous afternoon. Terri told her Ortega had called and asked her to meet him at the mall. Glenda also told Sergeant Jackson that Ortega had threatened Terri on a previous occasion.

Sergeant Jackson requested another officer, Sergeant Sanford, to watch Ortega's house. Jackson asked Sanford to stop Ortega if he left the house and to ask him to come to the police department to discuss Terri's disappearance. When Sanford arrived at the residence he noted Ortega's car was parked outside. Another car pulled up in front of the Ortega residence and a male came out of the house and got into the car. When the car departed Sanford made arrangements by radio with Officer Young who was nearby in a marked police car to conduct a traffic stop of the vehicle.

Officer Young stopped the car and asked the passenger if he was Ortega. Ortega acknowledged his identity and Young radioed the information to Sanford who arrived on the scene in less than one minute. Sanford identified himself and confirmed Ortega's identity. He explained he was investigating the disappearance of Terri Winchell and needed to talk to Ortega concerning that subject. Ortega volunteered that he understood since he was supposed to have been the last person to have seen her. Sanford asked if he would mind coming to the police department to discuss the matter. Ortega said he would not mind and accompanied Sanford to the station house.

At the station house Ortega was advised of his *Miranda* rights and nonetheless agreed to discuss the matter. During interrogation he stated that Terri was "sleeping in a field" on the other side of Lodi. Thereafter, he led Jackson and a deputy district attorney to a vineyard where Terri was found, dead.

Ortega implicated Morales in the homicide in his statements. Subsequently, officers obtained an arrest warrant for Morales and a search

warrant for the house he was staying in. Morales was arrested and he and Ortega appeared jointly at a preliminary examination.

At the outset of the hearing both moved for the exclusion of all unauthorized persons pursuant to Penal Code section 868. The first witness called was Raquel C., Morales' girl friend. Raquel, 17 years old, had been charged as an accessory to the alleged crimes in juvenile court and agreed to testify in return for immunity. She was accompanied to the hearing by her attorney, her mother and her mother's English-Spanish interpreter. Petitioners objected to the presence of the last two persons on the ground they were not authorized to be present at a closed preliminary examination. The objection was overruled.

Raquel testified she was with Morales at the house he was staying at in Stockton on January 8. About 4:30 p.m. he answered the phone and thereafter informed her the caller had been Rick Ortega who was going to pick up a girl and come over about 6 p.m. He told her he was going to do Rick a favor, that he was going to hurt a girl for Rick. (Ortega's subsequent statements to police officers, not admitted as evidence against Morales, imply Ortega was motivated by anger at the victim for telling people he was a homosexual.) At 5:30 p.m. Ortega came to the house. A little before 6 p.m. he left saying he was going to the mall to pick up a girl. He returned in about 20 minutes and he and Morales departed together.

A little after 7:30 p.m. they returned. Morales came in first holding a purse and a belt. He threw the belt to Raquel announcing "'The belt broke.'" He showed her a school identification card with the name Terri Winchell on it. His hands and face had little specks of blood on them. At Morales' direction Raquel went outside and looked at Ortega's car. There were spots of blood on the door and seat. She returned to the house and overheard Ortega ask Pat Flores how to take blood off his sweater. Later she overheard Morales say "she [Terri] was a tough girl."

Raquel explained Morales later informed her he and Ortega drove Terri to a vineyard near Lodi. On the way he tried to strangle her but his belt broke. He hit her on the head with a hammer more than a dozen times to knock her out, then dragged her off and left her in the vineyards. The day after the homicide Morales told her he regretted it and that he should have talked Ortega out of it.

Pat Flores also testified at the preliminary examination. Morales had been staying in her house for about three weeks prior to the homicide. On Wednesday, January 7, the day before the homicide, Pat was sitting at the kitchen table when Morales, who was behind her, threw his belt around her neck. She asked what he was doing and he said he was "practicing something." She corroborated Raquel's account of the events that occurred at her house on January 8. She added that after Ortega and Morales left she searched for her hammer to hang a picture and discovered that it and her knife were missing. She found both wet, lying on her dish counter shortly after Morales and Ortega returned. Morales gave her an account of Terri's death essentially parallel to that he related to Raquel. However, Pat's account included the additional information that after he dragged the victim into the vineyard he stabbed her. She testified she turned over to the police a purse (later identified as Terri's) she found in the closet of the room Morales occupied.

The pathologist testified he examined Terri Winchell's body and found at least seventeen deep gashes on the back of the head, seven deep gashes on the right side, multiple small lacerations and contusions of the face area, multiple bruises over the forearms and hands, and four stab wounds in the chest. She was alive when the stab wounds were administered. She might have survived for 10 minutes after receiving these wounds.

DISCUSSION

I

Petitioners contend the presence of Raquel C.'s mother and her interpreter at the preliminary hearing rendered their commitment unlawful within the meaning of Penal Code section 995.[2] Failure to remove all persons not listed in Penal Code section 868 from the preliminary examination on a defendant's request is error. (*People* v. *Elliot* (1960) 54 Cal.2d 498 [6 Cal.Rptr. 753, 354 P.2d 225].) Pretrial application for relief from such error requires the information to be quashed without any showing of prejudice. (See *ibid.*; *People* v. *Pompa-Ortiz, supra,* 27 Cal.3d at p. 529.) Petitioners' contention raises the issue whether the witness' mother and her interpreter were properly allowed to attend the hearing.

---

[2]The same claim is tendered concerning the presence of Raquel's attorney. However, no objection was made below by petitioners to the presence of the attorney. Therefore, we decline to entertain it. (See *People* v. *Griffin* (1961) 195 Cal.App.2d 855 [16 Cal.Rptr. 388].)

Section 868 provides only one possible basis for their presence. "[A] prosecuting witness may, in the discretion of the court, be entitled for moral support to the attendance of one person of his or her own choosing otherwise not a witness." (Pen. Code, § 868.) Resolution of the question presented depends upon the meaning of the term "prosecuting witness" in this provision.

Petitioners argue "prosecuting witness" means the victim or person who brings the criminal complaint. The cases upon which the parties rely in addressing this argument are inapposite, since they construe the term "prosecutor" and not the term at issue.[3] Unfortunately, no case has construed "prosecuting witness" as used in section 868. The legislative history provides no guidance on this point. Therefore, we must give content to the term based upon the usage of the phrase and the purposes of section 868.[4]

The phrase "prosecuting witness" is ordinarily used in two connections. It most often denotes the victim who is a witness. However, it is also employed more generally to refer to witnesses for the prosecution who are neither the victim nor the complainant. (See, e.g., *Curry* v. *Superior Court* (1970) 2 Cal.3d 707, 711, 715 [87 Cal.Rptr. 361, 470 P.2d 345]; *People* v. *Scholl* (1964) 225 Cal.App.2d 558, 560-562 [37 Cal.Rptr. 475].)[5] We assume this connotation was in usage when the statute was enacted. It was in use when the statute was amended to remove the limitation of application of the companionship provision to females. (Amended by Stats. 1976, ch. 1178, § 2, p. 5274.)

Obviously, the question in this case turns upon whether the broad or narrow meaning of "prosecuting witness" is selected. We opt for the broader meaning. Adherence to this definition will not materially impinge upon the legitimate interests of defendants the statute seeks to protect. On the other hand, it will help to obtain relevant and material testimony.

---

[3]These cases arose when defendants sought to have investigating police officers removed after a section 868 motion. (See generally, Annot., Right of Person Accused of Crime to Exclude Public from Preliminary Hearing or Examination (1970) 31 A.L.R.3d 816, and California cases digested therein.) This variety of dispute has been extinguished by amendment of the statute to include the investigating officer as an additional authorized person. (See Pen. Code, § 868.)

[4]See generally 2A Sutherland, Statutory Construction (4th ed. 1973) chapter 45.

[5]See also Black's Law Dictionary (4th ed. 1968) page 1385, column 2.

The exclusion of unauthorized persons from a preliminary examination has had two purposes attributed to it in prior cases. The primary purpose is to shore up the defendant's right to an impartial jury by preventing media accounts of the proceedings. (See, e.g., *People v. Elliot, supra*, 54 Cal.2d at p. 504.) Another purpose is to prevent the defendant from being maligned in the presence of unnecessary observers. (*Id.*, at p. 505.) However, under either definition of "prosecuting witness," the statute subordinates both purposes to other concerns if the prosecuting witness is the victim.

We see two other concerns that justify this override of the general prohibition of the statute. First is solicitude for the victim. Recounting the events of the crime may especially tax the victim and the presence of a companion may ameliorate this suffering. The second consideration is the state's interest in obtaining testimony from witnesses who are diffident or intimidated. Accusing another of a crime frequently takes courage and invariably involves emotional stress. The potential of obtaining truthful accusatory testimony from some witnesses is materially enhanced if they are assured they will not run the gauntlet of confrontation without the emotional support provided by the presence of a relative or friend.

This support is available for an accusatory witness at trial by virtue of the public nature of trial proceedings. We see no valid reason why it should not be available, when needed, at a preliminary examination. The interest of the defendant in an impartial jury can be granted by protective orders. The prospect the defendant may be unnecessarily maligned is tempered by two considerations. First, the companion will only hear the testimony of the witness he or she accompanies, an account they would likely hear in any event. Second, one more person hearing this portion of the proceeding does not substantially enhance the damage to the defendant's reputation or the degree of embarrassment likely to be felt. Moreover, since the companionship privilege is discretionary, it is unlikely to be granted unless warranted by the balance of these competing considerations. In light of our conclusion, we cannot deem the trial court's decision to allow Raquel's mother to be present during her testimony error per se.

Petitioners' final argument is, assuming arguendo Raquel's mother was properly admitted, it was error to admit her interpreter. They contend the statute provides only for one additional person for moral

support and it was error to allow two. We find this an unpersuasive quibble.

The choice of the companion is given to the witness by Penal Code section 868. Once the privilege is granted and the companion selected, the witness is entitled to the *attendance* of the companion. The purpose of companionship in these circumstances cannot be satisfactorily accomplished if the companion cannot understand what is said. Saying that which is hard to say is not likely to be eased by the presence of a companion who cannot understand what you are saying. Certainly petitioners could not contend that a witness who spoke only a language other than English could not testify because section 868 makes no explicit provision for an interpreter for the witness. Similarly, the contention that no interpreter is permitted for a companion falls on deaf ears.

## II

■ Petitioners' second joint contention is the evidence adduced at the preliminary examination is the fruit of the illegal arrest of Ortega. They argue the police officers had no probable cause to arrest Ortega and thus all of the evidence should be suppressed. The issue raised by this contention is whether the officers improperly detained or arrested Ortega.

In order for an investigative stop or detention to pass muster, "the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or is about to occur, and (2) the person he intends to stop or detain is involved in that activity." (*In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957].) Moreover, the suspicion must be objectively reasonable. (*Ibid.*)

The circumstances of Ortega's detention satisfied these tests. Sergeant Jackson had grounds for an objectively reasonable suspicion Terri Winchell was the victim of foul play and Ortega was involved. Her mother related it was highly unusual for her daughter to fail to call her. Terri's car was found locked and unattended at the mall. She informed Glenda Chavez that Ortega asked to meet her there. She also informed Glenda that Ortega asked her not to tell anyone where she was going (a hearsay statement admitted only for the purpose of showing reasonable suspicion). Finally, Jackson was told Ortega had threatened Terri in the

past. Given these circumstances there was sufficient reason to detain Ortega to inquire about Terri's welfare.

Sergeant Sanford had grounds to entertain an objectively reasonable suspicion that the person to be stopped was Ortega. Ortega's car was parked outside his house, implying he was at home. The male suspect came out of the house Ortega was presumably in. In light of the potentially grave nature of the investigation the inconvenience of a traffic stop was warranted in these circumstances.

Petitioners next posit the novel theory that Ortega's detention was illegal because the officers did not choose other, purportedly less intrusive, means to make inquiries of him. They argue the officers should have telephoned him or knocked on his front door. No contention is made that the choice of means was motivated by ill will or a desire to harass or injure Ortega. We decline to accept the invitation to introduce this unprecedented rationale into the law of detention. So long as the means chosen are lawful, the officers may select the alternative they consider most appropriate.

Petitioners' final argument is Ortega was arrested by Sanford without probable cause. They cite *People* v. *Harris* (1975) 15 Cal.3d 384 [124 Cal.Rptr. 536, 540 P.2d 632] for the proposition that the transportation of Ortega to the police station was unlawful. *Harris* announced the rule that transportation of suspects for interrogation or possible identification after an initial detention in the absence of probable cause to arrest must be justified by a showing that it is the least intrusive means of accomplishing the proposed objective. (*Id.*, at pp. 390-391.) However, *Harris* notes as an acceptable alternative to the proscribed involuntary transportation officers may seek and presumably act upon the suspect's consent. Here, Ortega's consent was obtained and *Harris* has no application.

Ortega was not illegally detained. He was not illegally transported or arrested. Thus, the contention that the fruits of his interrogation must be suppressed fails.

### III

Morales also contends the evidence adduced at the preliminary examination does not furnish reasonable or probable cause to hold him to answer various charges and allegations of special circumstances pre-

sented in the information. ■ Reasonable and probable cause (Pen. Code, §§ 995 and 999a) and the synonymous term sufficient cause (Pen. Code, §§ 871 and 872) mean "'such a state of facts as would lead a [person] of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused [citation].'" (See e.g., *Williams* v. *Superior Court* (1969) 71 Cal.2d 1144, 1147 [80 Cal.Rptr. 747, 81 Cal.Rptr. 761, 458 P.2d 987].)

■ To withstand scrutiny when attacked on the ground of evidentiary sufficiency, it must appear some showing of the existence of each element of the charged crime was made at the preliminary examination. The showing may be made by means of circumstantial evidence supportive of reasonable inferences. (*Id.*, at p. 1148.) The level of proof need not be sufficient to support a conviction. (Id., at p. 1150.) Indeed, every reasonable inference that may be drawn from the evidence must be drawn in favor of the information. (*Rideout* v. *Superior Court* (1967) 67 Cal.2d 471, 475 [62 Cal.Rptr. 581, 432 P.2d 197].)[6] With these principles in mind we turn to Morales' remaining contentions.

■ The first charge he addresses is robbery. One requirement for proving a robbery is a showing that the act of force or intimidation by which the taking of property is accomplished was motivated by the intent to steal. (*People* v. *Green* (1980) 27 Cal.3d 1, 52-54 [164 Cal.Rptr. 1, 609 P.2d 468].) Morales argues no evidence shows an intent to steal motivated the attack on Terri Winchell and therefore no reasonable or probable cause exists to hold him to answer to a charge of robbery.

Ordinarily, a showing that defendant took property from the victim of an assault provides a strong inference that the act of force was motivated by an intent to steal. However, the usual inference may be weakened here and not available. Morales submits the evidence shows

[6]Probable cause sometimes connotes """'... 'having more evidence for than against ....'"""' (See e.g., *People* v. *Ambrose* (1957) 155 Cal.App.2d 513, 521 [318 P.2d 181].) However, as the requirement to draw *every* favorable inference implies, this meaning does not obtain in the context of reasonable and probable cause to hold for trial. "[I]f there is some evidence to support the information, the court will not inquire into its sufficiency." (See, e.g., *Rideout* v. *Superior Court, supra*, 67 Cal.2d 471, 474.) The balance is tipped to justification of holding over short of proof by a preponderance —it "encroaches upon the right of a person to be free from prosecution for crime unless there is some rational ground for assuming the *possibility* that he is guilty." (Italics added.) (*Greenberg* v. *Superior Court* (1942) 19 Cal.2d 319, 322 [121 P.2d 713]; see generally 59 A.L.R. 567.) The alternative rule would induce preliminary examinations to escalate into full-blown trials. (Compare *People* v. *Green* (1969) 70 Cal.2d 654, 663-664 [75 Cal.Rptr. 782, 451 P.2d 422].)

the most likely explanation of the events is the victim was attacked as a result of some motive other than to acquire her purse and it remained in the car after the attack accidentally. If this account is correct no robbery occurred. (See *People* v. *Green, supra,* 27 Cal.3d at pp. 52-54.) The argument continues, since this version of the events is the most probable based on the evidence, there is no reasonable or probable cause sufficient to bind him over for trial.

We are not at liberty to select from available inferences. The evidence permits two inferences about Morales' intent. He may have formed an intent to take Terri's purse before the attack or he may have been oblivious to the purse until he returned to the car after the attack was completed. No item of evidence lends differential weight to either inference. If the same evidence is presented at trial the jury could not find Morales guilty of robbery.[7] However, as related above, the evidence to support an information need not be sufficient to support a conviction. It is possible to infer that Morales was aware Terri was carrying a purse and to infer he resolved to take it from her before the attack. We are required to accept that inference in reviewing the sufficiency of the information. It provides reasonable and probable cause to support a charge of robbery.

## IV

■ Morales next contends the allegation the murder involved the infliction of torture within the meaning of Penal Code section 190.2, subdivision (a)(18), a special circumstance, is not supported by reasonable and probable cause. He argues a conviction of such a murder requires more than circumstantial evidence of a specific intent to cause pain. He posits only circumstantial evidence of intent to cause pain was adduced and concludes this showing is insufficient.

The contention raises three issues. What is the meaning of the term torture? Must direct evidence of a specific intent to inflict pain be produced at a preliminary examination to support an allegation of torture in an information? Finally, was direct evidence of intent to inflict pain adduced in this case? We note the standard for evidence sufficient to hold the defendant to answer the special circumstances allegations is

---

[7] See CALJIC No. 2.02, if specific intent is proved by circumstances a finding of guilty is possible only if "the proved circumstances not only are consistent with the theory that he had the required specific intent but cannot be reconciled with any other rational conclusion."

the same as for charges of complete crimes. (*Ghent* v. *Superior Court* (1979) 90 Cal.App.3d 944, 955 [153 Cal.Rptr. 720].)

■ We agree with Morales that conviction of murder with torture as a special circumstance requires proof of a specific intent to inflict pain. We see no reason to depart from that settled meaning of the term torture in the case law interpreting Penal Code section 189. (See *People* v. *Wiley* (1976) 18 Cal.3d 162 [133 Cal.Rptr. 135, 554 P.2d 881].) This denotation distinguishes between the purposeful infliction of pain for personal gain or satisfaction and the incidental infliction of pain that accompanies almost all assaults or murders. We reject the suggestion in *Engert* v. *Superior Court* (1980) 103 Cal.App.3d 688 [163 Cal.Rptr. 267] that this specific intent is not essential.[8]

■ Morales is not as successful with the remainder of his arguments. His reasoning that some direct evidence must be shown to support an information with a special circumstances allegation of torture because direct evidence is needed to support a guilty verdict is flawed. As related previously, the standard for conviction is not applicable when evaluating the information. However, a more grievous defect in his argument precludes reaching this question. There was evidence that prior to the homicide Morales told Raquel that he had agreed to "hurt" a girl as a favor for Ortega. Even if we accepted Morales' premise, this statement provides a sufficient basis in direct evidence of a specific intention to inflict pain for personal gain or satisfaction to support the challenged special circumstances in the information.

## V

■ Morales' penultimate contention is there is no reasonable and probable cause to support the allegation the murder was committed by lying in wait, a special circumstance provided in Penal Code section 190.2, subdivision (a)(15). He argues no specific intent to kill is sufficiently demonstrated. Assuming arguendo specific intent is needed (but

---

[8]*Engert's* conclusion was not required by the holding and is not compelled by the language of Penal Code section 190.2, subdivision (a)(18). The provision states "torture requires proof of the infliction of extreme physical pain no matter how long its duration." However, in our view, the proviso states a necessary condition for showing torture but not a sufficient condition. Any other construction would conflict with the ordinary usage of the term. As an initiative was the origin of the provision, this usage must be ascribed as the meaning intended. Moreover, as petitioner observes, any other construction would certainly lead into a morass of constitutional infirmity in the attempts to prize off those painful murders that would qualify as torture.

see *People* v. *Benjamin* (1975) 52 Cal.App.3d 63, 82-84 [124 Cal.Rptr. 799]), the contention borders on the realm of frivolity. In light of the foregoing discussion, it suffices to note a circumstantial inference of specific intent to kill arose, inter alia, from the testimony that in addition to his belt Morales apparently armed himself with Pat Flores' hammer and knife before leaving the house with Ortega to "hurt" Terri Winchell.

## VI

■ Morales' final contention is no reasonable and probable cause warrants the charge of conspiracy to commit murder. He argues it is clear from the evidence there was no common intent to commit murder. He premises this bald assertion on the statement by Ortega during interrogation that he did not know exactly what was going to happen after the victim was rendered unconscious. The only thing that is clear about this ambiguous statement is that it is self-serving. Even had it been testimony by Ortega presented at the preliminary examination, the trier of fact was free to reject it. (Cf. *Lorenson* v. *Superior Court* (1950) 35 Cal.2d 49, 57 [216 P.2d 859].) There is overwhelming evidence of a prior agreement to cooperate in assaulting the victim. Given the circumstances of Terri's death, ample evidence was provided to allow an inference this agreement contemplated a murder. This inference is sufficiently strong to validate this charge in the information.

### DISPOSITION

None of the points raised by petitioners is meritorious. The petition is denied. The order staying further proceedings in the trial court is dissolved.

Evans, Acting P. J., and Carr, J., concurred.

Petitioners' applications for a hearing by the Supreme Court were denied October 13, 1982.