[No. B070917. Second Dist., Div. Five. Feb. 8, 1993.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
MIGUEL ANGEL QUINTEROS, Real Party in Interest.

## COUNSEL

Ira Reiner, District Attorney, Donald J. Kaplan and Dirk L. Hudson, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Fritzie Galliani, William J. Hardy and Gary M. Mandinach for Real Party in Interest.

## OPINION

**BOREN, J.\*—**After respondent superior court dismissed all but one count of the criminal information filed in this case, the People petitioned this court to issue a writ of mandate and requested that the trial of real party in interest Miguel Angel Quinteros (defendant) be stayed until this court determined the merits of the petition. We have stayed the trial proceedings and issued an alternative writ of mandate. Defendant filed an opposition to the petition, and we held a "show cause" hearing on December 1, 1992. Finding that the People's contentions have merit, we have determined that a peremptory writ should issue.

### BACKGROUND

Defendant, along with two other defendants—Abel Santamaria and Enrique Pantaleon, was charged in an information filed by the district attorney on July 27, 1992, with one count of murder (count 1), one count of conspiracy (count 2) and three counts of assault (counts 3-5).[1] In count 6 of the information, defendant alone was charged with commission of the crime of extortion.

Respondent superior court granted motions to set aside the information as to counts 1 through 5 as to defendant. Defendant brought these motions

---

\*Presiding Justice of the Court of Appeal, Second District, Division Two, sitting under assignment by the Chairperson of the Judicial Council.

[1]Codefendant Santamaria has gone to trial separately, and, after all counts were dismissed as to codefendant Pantaleon, the People elected to proceed by way of appeal as to him.

under Penal Code sections 995, 1385, 1387, and 1387.1.[2] Respondent superior court then dismissed the information as to those counts, and defendant's trial on the remaining count of extortion was scheduled for October 30, 1992. We ordered that trial stayed until our review is complete.

A previous information had been filed under another case number as to the crimes alleged in the present information. In that information, defendant was charged only with a violation of section 187, murder. His codefendants were charged with felony assault, and defendant Pantaleon was charged with robbery in violation of section 211. Respondent superior court granted defendant's section 995 motion and set aside the information as to defendant. Subsequently, in order to reframe the charges, the People moved to dismiss as to codefendants Pantaleon and Santamaria. As to the codefendants, respondent superior court granted the People's motion to dismiss but not before noting that it found the People to be acting in bad faith as to the codefendants. Respondent superior court believed that the prosecuting attorney was moving to dismiss in order to gain advantage over the codefendants because the prosecution was not prepared to go to trial at that time. Nonetheless, respondent superior court felt legally obligated to dismiss the charges against the codefendants and did so. A new felony complaint was then filed in the municipal court on July 2, 1992. The charges in this felony complaint were essentially identical with those filed in the information which is at issue here. The magistrate held defendant to answer only as to count 6 of the information, which charged defendant with a violation of section 524, extortion.

Defendant filed a motion to dismiss the ensuing information pursuant to sections 1387, 1387.1, and 1385 on the principal ground that these charges were being filed for the third time in violation of the bar against further prosecution provided in section 1387. Defendant also moved to set aside the information pursuant to section 995 on the grounds of insufficiency of evidence to sustain the charges. The trial court granted both motions. In its petition, the People contend that, pursuant to section 1387.1, the People are entitled to file the murder charge for a third time and that the remaining charges have not been dismissed two previous times as the bar under section 1387 requires. The People also contend that the evidence presented at the preliminary hearing was sufficient to show that defendant conspired with codefendants and others to assault the victims in this case and that a conspirator is criminally liable for the acts of his coconspirators which follow as a probable and natural consequence of the common design encompassed by the conspiracy.

---

[2]All further statutory references are to the California Penal Code unless otherwise noted.

DISCUSSION

I

Defendant properly concedes that respondent superior court erred in granting the motion to dismiss pursuant to section 1387.1. Section 1387 does provide that a prosecution is barred if a felony charge has previously been twice dismissed.[3] Section 1387.1 provides an exception to the bar provided in section 1387. Section 1387.1 provides: "(a) Where an offense is a violent felony, as defined in Section 667.5 and the prosecution has had two prior dismissals, as defined in Section 1387, the people shall be permitted one additional opportunity to refile charges where either of the prior dismissals under Section 1387 were due solely to excusable neglect. In no case shall the additional refiling of charges provided under this section be permitted where the conduct of the prosecution amounted to bad faith. [¶] (b) As used in this section, 'excusable neglect' includes, but is not limited to, error on the part of the court, prosecution, law enforcement agency, or witnesses." Thus, the exception under section 1387.1 is available to the prosecution whenever the prior dismissals (1) were due solely to excusable neglect and (2) there was not bad faith conduct on the part of the prosecution. (*Tapp* v. *Superior Court* (1989) 216 Cal.App.3d 1030, 1035 [265 Cal.Rptr. 267].)

In the instant matter, only count 1—the charge of murder—has been previously twice dismissed. The first dismissal was pursuant to section 995 on the ground of insufficiency of evidence. The second dismissal was on a like ground but was rendered by the magistrate at the second preliminary hearing. Defendant does not contest that the "excusable neglect" standard may be properly applied to both dismissals. Certainly, as to the first information that was filed, the prosecution had neglected to press a theory of conspiracy which it has raised in conjunction with the refiling in this case. And, obviously, if under that theory there was sufficient evidence to hold defendant to answer on the charge of murder, the magistrate's subsequent error in refusing to hold to answer constitutes excusable neglect as well. It appears from the instant record that respondent superior court erroneously found bad faith on the part of the prosecutor as represented in the previous hearing on the motion to dismiss pertaining to the two codefendants. Whether or not bad faith occurred on that occasion is essentially irrelevant in the instant case, since at that time the initial charge of murder against defendant had been dismissed pursuant to the first section 995 motion. Thus,

[3]In pertinent part, section 1387, subdivision (a), provides: "An order terminating an action pursuant to this chapter or Section 859b, 861, 871, or 995, is a bar to any other prosecution for the same offense if it is a felony . . . and the action has been previously terminated pursuant to this chapter, or Section 859b, 861, 871, or 995 . . . ."

respondent superior court clearly could not have found bad faith on the part of the prosecutor with respect to defendant. Accordingly, the requirements for the exception presented in section 1387.1 were met, and defendant's concession on this point is well taken.

## II

Respondent superior court also dismissed the information herein (the accusatory pleading filed after the second dismissal herein, i.e., the third filing) on the ground of insufficiency of evidence pursuant to section 995. Defendant contends that the trial court properly granted the section 995 motion and that on this basis the petition for writ of mandate should be denied. We find otherwise.

On the evening of October 18, 1991, the murder victim, Jason Escobedo (Jason) went to Will Rogers State Beach with Billy Reyes (Billy), Zonia Petraza (Zonia) and Irene Melendez (Irene). Jason went into a restroom and became involved in an altercation with defendant. Billy ran into the restroom and intervened. Defendant, a member of the "Southside 13" gang, issued a standard gang challenge, asking Jason "where he was from," to which Jason replied that he was not a gang member. Defendant also told Billy that if Billy gave him $2 defendant would forget the whole thing. Thereupon, Billy punched defendant in the face and a fight ensued. Zonia arrived on the scene to find defendant on top of Billy. Jason then pulled the two combatants apart and apologized to defendant for "stepping into his territory."[4] Defendant responded by punching Jason in the mouth. Immediately thereafter, defendant whistled toward the beach and made a beckoning motion with his hands.

Jason, Billy, Zonia, and Irene then ran for Billy's truck, the vehicle in which they had arrived at the beach, and tried to leave the parking lot. They found the exit locked and returned to where they had previously parked. Since it appeared at that point that no one was around, Jason and Billy went down to the beach to retrieve some of the belongings they had left behind.

While the two girls remained in the truck, another truck pulled up alongside of them and eight young males got out, among them defendant. Defendant and two others began bashing the truck with a trash can, a barbell

---

[4]Evidence was presented at the preliminary examination indicating defendant and his codefendants were members of the Southside 13 gang. A lifeguard station, located 20 feet from the restroom where the initial altercation occurred and near which the murder victim's body was found, was painted with graffiti related to the defendants' gang. On two doors of the lifeguard station were painted the name "Southside 13," as well as its associated graffiti symbol "SS13." The moniker of codefendant Pantaleon—"Snoopy"—was also painted on the station.

and their fists. The rest of the males ran toward the beach just as Billy and Jason were returning. Despite the pleas of Zonia and Irene that they were "just girls," defendant and the other two who, with him, were bashing the truck were unmoved; one said he didn't care and then started smashing the truck windows. Another male, Jose Alvarez, who testified at the preliminary hearing, got into Billy's truck and wrestled the keys from Irene, who, by that time, had succeeded in starting the truck and had begun backing it up.

Billy managed to make it back to the truck, but Jason was surrounded and could not escape. Billy, Zonia, and Irene drove to a gas station nearby and telephoned "911." The police arrived in "about 15 minutes." However, by that time Jason lay dead on the other side of the restroom, his head having been severely beaten.

Although there were about 15 Southside 13 gang members present at the scene, only 3 were charged with the crimes against Jason, Billy, Zonia, and Irene: defendant, known as "Dreamer," codefendant Enrique Pantaleon, known as "Snoopy," and Abel Santamaria, known as "Drifter."

At the preliminary hearing, Rigoberto Rojas, another Southside 13 gang member who was present at the crime scene, testified that he was one of approximately 15 gang members who went to the beach that night, arriving by car and truck. He testified that defendant went to the restroom, came back bleeding and said that he had been "jumped by two guys." After that, one of the gang members said, "Fuck it. Let's go get him." At that point, all the gang members went to the restroom area "looking for them," the victims. Defendant and the gang members with him drove around a bit until they noticed Billy's truck with the two girls inside. They decided to "trash" it because they could not see the two guys who had been in the confrontation with defendant. Subsequently, they saw the "two guys," described as a "skinny guy" (Billy) and a "fat guy" (Jason), as those two were coming back up from the beach. The gang members jumped the two, whereupon, according to Rojas, the "skinny guy" hit defendant with a metal pipe, knocking him unconscious. Zonia, however, testified that Billy never had a pipe or anything else in his hand. Billy then fled in the truck with the two girls. At that point, the gang members turned their attention to the "fat guy" and began beating him. Codefendant Santamaria picked up a metal pole (three feet long, three inches wide) which, according to Rojas, had been left by Billy, and with assistance from another younger gang member, hit Jason over the head with it, knocking him unconscious.

Another gang member, Jose Alvarez, also testified at the preliminary hearing. He stated that he had been the one who wrestled the truck keys

away from Irene. He also saw defendant being struck with "a stick," rendering defendant unconscious. Alvarez also testified, as had Rojas, that the gang's intention was to beat up Jason and Billy.

■ The evidence is sufficient to support the charges in the information which was set aside. ■ Where "[n]othing in [the magistrate's comments] can be interpreted as a factual finding . . . ," but at best merely indicate "the magistrate formed the ultimate, legal conclusion that the evidence was insufficient to show probable cause . . ." (*People v. Superior Court (Day)* (1985) 174 Cal.App.3d 1008, 1017 [220 Cal.Rptr. 330]), "the ultimate question [on refiling a charge in the information] is whether the . . . charge finds evidentiary support in the record." (*Id.* at p. 1020.) To support a felony information, there need be only "some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it" (*Dudley v. Superior Court* (1974) 36 Cal.App.3d 977, 983 [111 Cal.Rptr. 797]), and an information will not be set aside or a prosecution prohibited thereon if this standard is met. (*People v. Slaughter* (1984) 35 Cal.3d 629, 641 [200 Cal.Rptr. 448, 677 P.2d 854].)

■ Here, the preliminary hearing magistrate made no adverse factual finding but expressly stated that he was holding the evidence as to the conspiracy charged in count 2 and as to defendant's involvement in counts 1, 3, 4, and 5 to be insufficient as a matter of law. ■ A conspiracy is shown by evidence of an agreement between two or more persons with the specific intent to agree to commit a public offense and with the further specific intent to commit such offense, which agreement is followed by an overt act committed by one or more of the parties for the purpose of furthering the object of the agreement. (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 156, p. 173.) The agreement or the unlawful design of conspiracy may be proved by circumstantial evidence without the necessity of showing that the conspirators met and actually agreed to commit the offense which was the object of the conspiracy. (*People v. Zamora* (1976) 18 Cal.3d 538, 559 [134 Cal.Rptr. 784, 557 P.2d 75].)

While mere association does not prove a criminal conspiracy (*People v. Manson* (1976) 61 Cal.App.3d 102, 126 [132 Cal.Rptr. 265]), common gang membership may be part of circumstantial evidence supporting the inference of a conspiracy. (*People v. Frausto* (1982) 135 Cal.App.3d 129, 140-141 [185 Cal.Rptr. 314].) The circumstances from which a conspiratorial agreement may be inferred include "the conduct of defendants in mutually carrying out a common illegal purpose, the nature of the act done, the relationship of the parties [and] the interests of the alleged conspirators

. . . ." (*People* v. *Remiro* (1979) 89 Cal.App.3d 809, 843 [153 Cal.Rptr. 89, 2 A.L.R.4th 1135].)

 Here, evidence of a conspiratorial agreement was abundant. Defendant and the others who sought to act against the victims were members of a street gang known as the "Southside 13" gang. The presence of that gang's graffiti with gang-related monikers at the scene in the vicinity of the decedent's body graphically shows the gang had marked Will Rogers State Beach as part of its gang territory. Defendant's acts in issuing the gang challenge "Where are you from?" and attempting to extort money for the right to have intruded into Southside 13 gang territory evidence a relationship between the territory and defendant's and his fellow gang members' conduct toward the victims. Indeed, the murder victim tried to apologize to defendant for having trespassed into the "territory" of defendant's gang.

Zonia testified that after defendant had struck Jason, he whistled and beckoned for his fellow gang members. Defendant's fellow gang member Rojas testified that after defendant told him what had happened to him in the restroom, one of the other gang members said, "Fuck it. Let's go get him." Thereupon, the gang members proceeded to seek out the two intruders into their territory in order to beat them up. This evidence sufficiently shows the existence of an agreement coupled with the requisite specific intent (to find the two intruders and beat them up), along with overt acts (the assaults on Jason, Billy, Zonia, and Irene) in which defendant directly participated, whether or not he was conscious at the time that the fatal blows were struck to the head of Jason. A conspirator is criminally liable for the acts of coconspirators which follow as a probable and natural consequence of a common design, even where those acts were not intended as part of the original design or common plan. (*People* v. *Luparello* (1986) 187 Cal.App.3d 410, 442 [231 Cal.Rptr. 832].) The question of what constitutes a probable and natural consequence is a question for the trier of fact. (*Id.* at p. 443.)

 Here, the evidence at the preliminary hearing sufficiently establishes that defendant, along with his fellow gang members, designed to go and at the very least beat up Jason and Billy, who had been involved in the previous confrontation with defendant. Whether or not at some point during the carrying out of that design defendant was rendered unconscious does not absolve him of responsibility for a natural and probable consequence of the illegal conspiracy in which he participated. The murder of Jason and the assaults upon the other victims reasonably constitute natural and probable consequences of the conspiracy which was shown at the preliminary hearing. Hence, the information should not have been set aside.

## DISPOSITION

Let a peremptory writ of mandate issue commanding respondent superior court to vacate its orders of September 3 and September 15, 1992, setting aside as to real party in interest Quinteros counts 1 through 5 of the information and dismissing those counts as to Quinteros, and enter a new and different order denying the motions to dismiss and to set aside the information as to the counts concerning Quinteros.

Turner, P. J., and Grignon, J., concurred.

A petition for a rehearing was denied February 24, 1993, and the petition of real party in interest for review by the Supreme Court was denied April 21, 1993.