[No. B112683. Second Dist., Div. Three. Oct. 24, 1997.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
ELENA SHAMIS, Real Party in Interest.

COUNSEL

Gil Garcetti, District Attorney, George M. Palmer and Patrick D. Moran, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Flier & Ross, Theodore S. Flier and Andrew Reed Flier for Real Party in Interest.

OPINION

ALDRICH, J.—Respondent superior court granted a motion to dismiss counts of an information alleging murder and insurance fraud stemming from a staged freeway collision between an automobile and a big-rig truck on June 17, 1992. The People petitioned this court to issue a writ of mandate ordering reinstatement of the charges and requested that the trial of real party in interest, Elena Shamis, be stayed pending this court's determination of the merits of the petition. We stayed the trial proceedings and issued an alternative writ of mandate. Shamis filed an opposition to the petition and we held a "show cause" hearing on the matter on September 18, 1997. We

find the People's contention the trial court erred in dismissing the murder and insurance fraud counts has merit and determine a peremptory writ of mandate commanding reinstatement of the charges should issue.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Facts.*

Sometime in 1989 or 1990, Filemon Santiago was introduced to Elena Shamis.[1] Shamis was the office administrator for an attorney, Gary Paul Miller, and Santiago had gone to the office to discuss the "accident business." When Santiago spoke with Shamis about referring accident cases to Miller's law office, Shamis indicated Santiago would be paid between $4,000 and $5,000 per accident, depending on the number of people involved. When Shamis and Santiago discussed a "per head" rate, Shamis indicated Santiago would be paid between $1,100 and $1,200 for each individual involved in a particular accident. Santiago would be paid the fees approximately two weeks after making the referral, after the case was "verif[ied]." If the law office later "dropped" the case, Santiago would be required to either return his fee or make another referral without pay. The form of payment to Santiago was generally "half checks, half money" for referrals. A number of checks made out to Santiago were signed by Shamis.

Approximately nine months after he first began referring cases to Miller's law office, Santiago discussed with Shamis "how some of these accident cases came about." Shamis and Santiago discussed "how many people were [involved]" and whether the damage to the car exceeded $500. The cases referred by Santiago were almost always "rear-enders" involving at least three people. Shamis and Santiago discussed which insurance companies paid claims quickly and which did not, and Santiago was informed the office would not handle cases involving certain insurance companies because they took too long to pay claims. Santiago also spoke to Shamis about "getting money [to purchase] insurance" when he did not have enough money to "finance" a case. Santiago told Shamis that if he was to bring in accident cases, he would need "money to buy insurance for people who were going to be in the accidents." Shamis "did not refuse to give [Santiago] money for insurance." All of the cases for which Santiago sought money for insurance were staged. In total, Santiago referred three or four cases per week to Miller's office, the "majority" of which had been "staged." Santiago usually

---

[1]The facts are taken from the transcript of the preliminary hearing held over four days on November 15, 20, and 22, 1996, and January 10, 1997.

brought the cases to Shamis, who then sometimes discussed them with Miller.[2]

For a period of approximately three months, beginning in June of 1991, Santiago stopped referring cases to Shamis. In approximately September of 1991, he resumed making referrals and continued to do so until June 17, 1992. During that time, Santiago "sometimes" discussed with Shamis or Miller accidents that "occurred or would occur on the freeway." These conversations usually took place in Shamis's office. During at least one discussion, Shamis told Santiago that "the bigger [the] case, [the] bigger the money." Santiago understood this to mean that, while a "regular" street collision was probably worth about $35,000, a case which occurred on the freeway and involved an automobile and a big-rig truck could be worth $100,000 or more. After Santiago "brought in" a case involving a big-rig truck and an automobile, both Shamis and Miller indicated the accident was "good" and involved "great damage." Both Shamis and Miller then told Santiago to "bring in more [freeway truck] cases," and Santiago agreed to do so. Although he never told Shamis the accidents were staged, at one point Santiago informed her that he would "bring in an accident case [the] next week." Santiago later brought to the office eight more cases involving rear-end freeway collisions between big-rig trucks and automobiles. At some point, Santiago had a discussion with Shamis during which he requested an increase in the amount of money he was being paid for the big-rig cases.

Santiago was personally involved in at least one attempt at a "big-rig" accident. Santiago and three men, one of whom is Shamis's codefendant, Juan Carlos Amaya, met on 24th Street, near the intersection of San Pedro Street and Adams Boulevard in Los Angeles. Santiago had known Amaya for a number of years and the two men were friends. Amaya had staged a number of collisions which Santiago then referred to Miller's office. Santiago had paid Amaya as much as $3,000 for each of these referrals. On this particular day in either late May or early June of 1992, the men agreed Amaya would drive the lead car and Santiago would follow him. Amaya and Santiago were to position themselves in front of a truck. Amaya would brake, making it necessary for Santiago to brake in front of the big-rig. Two additional cars would pull up, one on each side of the big-rig, to prevent the truck from changing lanes. As the lead car veered off, the car immediately in front of the truck would slam on its brakes, causing the truck to rear-end the car. Although the men drove onto the freeway in their various cars, the group did not succeed in causing an accident that day.

On June 17, 1992, Jorge Sanchez was approached by his neighbor, Luis Perez. Perez told Sanchez that he could make $300 by helping Sanchez to

---

[2]Santiago also testified that, at some point in time, Shamis told him that she did not want cases referred to Miller's office unless the cases were "legitimate."

"make an accident." Sanchez, Perez and a man named Isiais got into a black car and drove to an area near 24th Street, where the group met Amaya, another man, and a woman. The woman got into the black car with Perez, Sanchez and Isiais. Amaya got into his own car and Amaya's male companion got into a third car. At some point, Perez got into the backseat of the black car and told Sanchez to get into the driver's seat. Sanchez did so and the three cars, with Amaya leading the group, drove onto the Interstate 5 freeway.

After driving for awhile, Sanchez saw a large big-rig pulling a trailer loaded with cars. Driving erratically as he attempted to follow Amaya, Sanchez maneuvered the black car behind Amaya's and immediately in front of the truck. When Amaya stepped on his brakes, Sanchez braked. The big-rig truck attempted to move around the black car, but was unable to do so. When Sanchez "slammed on [his] brakes," the truck driver lost control of the big-rig and was unable to avoid colliding with his car. The big-rig jackknifed and the trailer, which was fully loaded with cars, fell over onto the back of the black car, killing Perez.[3] Amaya, who was ahead of the accident, drove off the freeway. Later that day, Amaya telephoned Santiago and told him what had happened.

On June 18, 1992, the day after Perez was killed, Santiago went to see Miller. During their conversation, Miller told Santiago that, "because of the accident," Santiago should "leave the country." Santiago followed Miller's advice and went to Mexico. While in Mexico, Santiago ran short of funds and he sent a letter, addressed to both Miller and Shamis, asking for money. In the letter, Santiago claimed he needed $20,000 to " 'start a new life at a different place.' "

Karen Magdaas and Hilda Jones were legal assistants at Miller's law firm. When a case was first referred to the law office, either Shamis or Miller would review it. The case would then be given to any one of a number of assistants, who would attempt to settle the matter. Shamis was in charge of "that phase of the practice of the office." If a problem occurred, the case would go to Shamis or Miller. If an insurance investigator indicated the damages of a particular case did not coincide with the accident, the case would be handled by Shamis or Miller. Shamis or Miller would sometimes have these problem cases "dropped"; the law firm would send letters to the client and the insurance company indicating it would no longer handle the

---

[3]As a result of this collision, Sanchez pleaded guilty to involuntary manslaughter. Isiais Martinez and Rubidia Lopez, passengers in the car, were charged with murder and conspiracy to commit insurance fraud. (See *People* v. *Superior Court* (*Martinez*) (1993) 19 Cal.App.4th 738, 742, 750 [23 Cal.Rptr.2d 733].)

matter. After the law offices were searched by police officers and Miller was arrested in October of 1993, the firm dropped "a lot" of cases.

Shawn Ferris works with the California Department of Insurance investigating staged traffic collisions. On April 11, 1996, Ferris interviewed a man named Randy Harris. Harris told Ferris that, from sometime in the late 1980's until 1992, he had staged traffic accidents, then referred the cases to Miller's law office. Harris met Shamis at Miller's office. It was Harris's understanding that Shamis was "working the office . . . with Mr. Miller," and that if Miller were ever unavailable, Harris could see Shamis. In late 1991 or early 1992, Harris attended a meeting at Miller's office. Miller, Shamis, Santiago and a man named Emil Shamis were present, and the group discussed "mixing up accidents."[4] It was determined that if Santiago, who is Hispanic, and Harris, who is African-American, worked together, "they could be creating accidents which weren't all Hispanics or all Blacks but a mix . . . ." It was concluded it is "easier to get settlements when [the accidents don't] show a pattern" and that "insurance companies don't look at [the accidents] as closely if they [involve people] of mixed ethnic background[s]."[5]

During his investigation, Ferris seized a number of checks and other documents from Miller's office. Ferris determined that for the period between March of 1991 and October of 1992, Miller paid Shamis approximately $421,000.

### 2. *Procedural History.*

In an information filed on August 26, 1996, in case No. BA116066, real party in interest Elena Shamis and a codefendant, Juan Carlos Amaya, were charged with one count of murder (count one) (Pen. Code, § 187), three counts of conspiracy (counts two, three, and four) (Pen. Code, § 182), and seven counts of insurance fraud (counts five to eleven) (Ins. Code, former § 1871.1, subd. (a)(3)).[6]

Following the preliminary hearing, the magistrate held Shamis to answer to all the counts alleging insurance fraud, including count 11, which charged

---

[4]During an earlier interview, Harris told Ferris that only Miller and Santiago had been present at the meeting.

[5]At Miller's trial, which occurred prior to the preliminary hearing in Shamis's and Amaya's case, Harris did not testify that Shamis was present during any discussions involving staged accidents. In addition, at Miller's trial Harris testified he never told Miller that any of the accidents were staged and that it was his understanding Miller did not want any referrals from staged accidents.

[6]Insurance Code former section 1871.1, which prohibited the intentional submission of false or fraudulent insurance claims, was repealed in 1992. For offenses committed after 1992, see Penal Code section 550.

Shamis committed insurance fraud by knowingly causing or participating in the June 17, 1992, accident which caused Perez's death. However, after stating he had "problems with count 1 [the murder count] as to Miss Shamis only," the magistrate declined to hold her to answer to that charge.

On January 24, 1997, the People filed a second information pursuant to Penal Code section 739.[7] This information again charged Shamis with one count of murder (count one) (Pen. Code, § 187). The information also charged Shamis with one count of conspiracy to commit insurance fraud (count two) (Pen. Code, § 182; Ins. Code, former § 1871.1), one count of conspiracy to commit grand theft (count three) (Pen. Code, §§ 182, 487), and fourteen counts of insurance fraud (counts four to seventeen) (Ins. Code, former § 1871.1).[8]

In March of 1997, Shamis moved to set aside the information pursuant to Penal Code section 995.[9] At a hearing held on the matter on April 8, 1997, the trial court indicated it believed there was "a conspiracy to commit an inherently dangerous act[;] [¶] . . . [t]o set up an accident where [one] would brake in front of a big[-]rig." However, the trial court declined to hold Shamis to answer to the charges stemming from the fatal accident of June 17, 1992. The court stated, "What I am finding is that there is insufficient evidence to conclude that [Shamis] was involved in any conspiracy regarding this particular fatality, this particular staged accident." The trial court granted Shamis's section 995 motion to dismiss as to count one of the information, the murder charge, and count seventeen of the information, the count alleging insurance fraud in connection with the June 17 accident.

The People filed the present petition seeking a writ of mandate directing the trial court to reinstate the charges of murder and insurance fraud in connection with the June 17 collision.

---

[7]Penal Code section 739 states in relevant part: "When a defendant has been examined and committed [before a magistrate], as provided in Section 872, it shall be the duty of the district attorney . . . to file in the superior court . . . an information against the defendant which may charge the defendant with either the offense or offenses named in the order of commitment or any offense or offenses shown by the evidence taken before the magistrate to have been committed. . . ."

[8]Shamis was again charged with codefendant Juan Carlos Amaya. Amaya was charged in each of the counts, with the exception of count four which alleges insurance fraud occurring on or about December 25, 1990.

[9]Penal Code section 995, subdivision (a), states in relevant part: "[T]he indictment or information shall be set aside by the court in which the defendant is arraigned , upon his or her motion, in either or the following cases: [¶] . . . [¶] (2) If it is an information: [¶] (A) That before the filing thereof the defendant had not been legally committed by a magistrate. [¶] (B) That the defendant had been committed without reasonable or probable cause. . . ."

DISCUSSION

■ To determine whether charges in an information can withstand a motion to dismiss, "neither the superior court nor the appellate court may reweigh the evidence or determine the credibility of the witnesses." (*People v. Superior Court (Jurado)* (1992) 4 Cal.App.4th 1217, 1226 [6 Cal.Rptr.2d 242]; *People v. Laiwa* (1983) 34 Cal.3d 711, 718 [195 Cal.Rptr. 503, 669 P.2d 1278].) It is the magistrate who is the finder of fact. (*Ibid.*) However, "[w]here '[n]othing in [the magistrate's comments] can be interpreted as a factual finding . . . ,' but at best merely indicate 'the magistrate formed the ultimate, legal conclusion that the evidence was insufficient to show probable cause . . .' [citation], 'the ultimate question [on refiling a charge in the information] is whether the . . . charge finds evidentiary support in the record.' [Citation.]" (*People v. Superior Court (Quinteros)* (1993) 13 Cal.App.4th 12, 20 [16 Cal.Rptr.2d 462].)

■ Probable cause to hold a defendant to answer is shown if a person " ' "of ordinary caution or prudence [would be led] to believe and conscientiously entertain a strong suspicion of the guilt of the accused [citation]. . . ." ' " (*Ortega v. Superior Court* (1982) 135 Cal.App.3d 244, 256 [185 Cal.Rptr. 297].) "To support a felony information, there need be only 'some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it' [citation], and an information will not be set aside or a prosecution prohibited thereon if this standard is met." (*People v. Superior Court (Quinteros)*, *supra*, 13 Cal.App.4th at p. 20.) On review, "[e]very legitimate inference that may be drawn from the evidence must be drawn in favor of the information." (*Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197].)

Here, neither the magistrate nor the superior court made adverse factual findings. Instead, they impliedly and expressly found the evidence is insufficient as a matter of law to support the murder charge. The superior court also determined the evidence is insufficient as a matter of law to support the charge of insurance fraud alleged in connection with the June 17, 1992, fatal collision. However, both the magistrate and the superior court found the evidence sufficiently established probable cause to hold Shamis to answer to the counts alleging conspiracy.

■ "The doctrine of conspiracy plays a dual role in our criminal law. First, conspiracy is a substantive offense in itself—'an agreement between two or more persons that they will commit an unlawful object (or achieve a lawful object by unlawful means), and in furtherance of the agreement, [one or more of those persons] have committed one overt act toward the achievement of their objective.' [Citations.] Second, proof of a conspiracy serves to

impose criminal liability on all conspirators for crimes committed in furtherance of the conspiracy. Thus, 'where several parties conspire or combine together to commit any unlawful act, each is criminally responsible for the acts of his associates or confederates committed in furtherance of any prosecution of the common design for which they combine. In contemplation of law the act of one is the act of all.' " (*People* v. *Salcedo* (1994) 30 Cal.App.4th 209, 215 [35 Cal.Rptr.2d 539], quoting *People* v. *Kauffman* (1907) 152 Cal. 331, 334 [92 P. 861]; see *People* v. *Superior Court* (*Quinteros*), *supra*, 13 Cal.App.4th at p. 21.) Further, "a conspirator is criminally liable for the act of a coconspirator which follows as a probable and natural consequence of the common design, even though it [is] not intended as a part of the original design or common plan. [Citations.]" (*People* v. *Luparello* (1986) 187 Cal.App.3d 410, 442 [231 Cal.Rptr. 832].)

The complaint filed in superior court on January 24, 1997, alleged 16 overt acts committed in furtherance of the two alleged conspiracies, including the causing by conspirators of seven different "collisions" with big-rig trucks. Included, and alleged as overt act number 13, is the fatal collision which occurred on June 17, 1992. ■ A review of the evidence, as construed by the magistrate, supports the determination there is probable cause to believe Shamis committed the conspiracies and that those conspiracies included the staging of the fatal June 17 collision.

Shamis was a person of authority in the Miller law office. If Miller was unavailable, office personnel and others went to Shamis. She reviewed cases, attended meetings during which collisions between automobiles and big-rig trucks were discussed, and apparently had the authority to "drop" a case if problems arose. For her services, Miller paid Shamis over $400,000 in less than two years.

In addition, Shamis had significant contact with other conspirators. There is evidence Santiago discussed with Shamis "how some of these accidents came about" and that Shamis was the one who told Santiago how much he would be paid for accidents. Santiago also spoke to Shamis about "getting money to purchase insurance" when he did not have enough money to "finance" a case. Santiago specifically told Shamis that he would need money to "buy insurance for people who were going to be in [the] accidents." During at least one conversation, Shamis told Santiago that "the bigger [the] case, [the] bigger the money," and that a case which occurred on a freeway and involved a big-rig truck was preferred. Finally, Santiago and Shamis discussed an increase in the amount of money he would be paid for big-rig accidents.

On this record, a person of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion Shamis entered into

express or tacit agreements to defraud and steal from insurance companies by staging accidents involving automobiles and big-rig trucks, and that one or more coconspirators took overt acts in furtherance of the object of the conspiracy. Included among those acts was the staging of the accident between a car and a big-rig truck on June 17, 1992.

As a conspirator, Shamis is liable for the acts of her coconspirators which follow "as a probable and natural consequence of the common design, even though [they are] not intended as a part of the original design or common plan. [Citations.]" (*People* v. *Luparello, supra,* 187 Cal.App.3d at p. 442.) Here, the evidence shows collisions between cars and big-rigs were staged according to a particular plan. The car which was to be in the collision was loaded with two or three passengers so that the insurance claim would be larger. A lead car, followed by one or more others, would drive onto the freeway. The lead car and the car immediately behind it would position themselves in front of a big-rig truck. At times, two additional cars would pull up, one on each side of the big-rig, to prevent the truck from changing lanes. The lead car would then brake, making it necessary for the car behind it, and immediately in front of the big-rig, to break. The car immediately in front of the truck would then slam on its brakes, causing the truck to rear-end the car. That Perez's death was the probable and natural consequence of such a planned collision is beyond question.

■ Moreover, the circumstances of Perez's death support a charge of second degree murder. A prosecution for murder requires a finding of malice. (Pen. Code, § 187, subd. (a); see *People* v. *Watson* (1981) 30 Cal.3d 290, 296 [179 Cal.Rptr. 43, 637 P.2d 279].) ■ "[S]econd degree murder based on implied malice has been committed when a person does an ' " 'act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' " . . . .' [Citations.] Phrased in a different way, malice may be implied when [a] defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life. [Citation.]" (*People* v. *Watson, supra,* 30 Cal.3d at p. 300; see *People* v. *Nieto Benitez* (1992) 4 Cal.4th 91, 103-104 [13 Cal.Rptr.2d 864, 840 P.2d 969].)

■ Here, Shamis's coconspirators staged an accident between a passenger car and a big-rig truck for the base, antisocial purpose of defrauding and stealing large amounts of money from insurers. The staging of the June 17, 1992, accident involved intentionally placing three passengers and a driver in a passenger car, driving the car onto the Interstate 5 freeway,

driving the car immediately in front of a fully loaded big-rig truck, then slamming on the car's brakes to cause the truck to collide with the car. If this conduct does not show a wanton, reckless disregard for human life, we would be hard pressed to find conduct which would. (See *People v. Watson, supra*, 30 Cal.3d at p. 301.)

Shamis's assertion she cannot be held to answer for Perez's murder because he was a coconspirator who "intentionally helped [to] create the danger[ous] [incident]," is without merit. Her reliance on the court's decision in *People v. Antick* (1975) 15 Cal.3d 79 [123 Cal.Rptr. 475, 539 P.2d 43] is misplaced.

In *Antick*, Antick's accomplice, a man named Bose, "initiated a gun battle with the police in order to escape apprehension for a burglary which he and [Antick] had . . . committed. The police officer responded by killing Bose." (*People v. Antick, supra*, 15 Cal.3d at p. 90.) The court indicated Bose's conduct in initiating a shootout with police could establish the malice required for murder. "However, [the court determined,] Bose's malicious conduct did not result in the unlawful killing of *another* human being, but rather in Bose's own death. The only homicide which occurred was the justifiable killing of Bose by the police officer. [Antick's] criminal liability certainly [could not] be predicated upon the actions of the officer. As Bose could not be found guilty of murder in connection with his own death, it is impossible to base [Antick's] liability for this offense upon [the] vicarious responsibility for the crime of his accomplice." (*Id.* at p. 91, italics in original.) ▮ In reaching this conclusion, however, the *Antick* court recognized that, in general, an accomplice will be " '. . . vicariously responsible for any killing attributable to the intentional acts of his associates committed with conscious disregard for life, and likely to result in death,' [citation] even though the immediate cause of death was the act of a third party." (*Ibid.*) It is only in cases like *Antick*, where the defendant's responsibility for murder is based on his vicarious liability for the acts of an accomplice *who could not himself have been guilty of the offense* that liability will not lie. (*Ibid.*)

▮ Here, Perez, who would have been Shamis's coconspirator, died as a result of the big-rig accident. We recognize that, since Perez cannot be found guilty of murder in connection with his own death, Shamis's vicarious liability for Perez's murder cannot be based solely upon Perez's conduct. However, that does not preclude Shamis's vicarious liability based on the conduct of any number of other coconspirators.

In *People v. Mai* (1994) 22 Cal.App.4th 117, 127 [27 Cal.Rptr.2d 141], the court noted that in cases involving vicarious liability, the "provocative

act doctrine" is frequently implicated. The court stated, that in such cases, "the trier of fact will always be confronted with a chain of events involving at least three—but often more—individuals: By definition, the doctrine cannot apply unless there are two or more cofelons and the provocative acts by those who survive are sufficiently egregious to provoke a lethal response by a victim, police officer, bystander, or some combination of the foregoing. But in the typical case, . . . the accomplice who is killed also engaged in provocative conduct. This means there are usually several layers of proximate cause analysis . . . . One is whether the defendant engaged in provocative conduct that can fairly be labeled as a proximate cause of an accomplice's death. Another . . . is whether a surviving cofelon engaged in provocative conduct that can fairly be labeled as a proximate cause of an accomplice's death. If so, then even when the defendant on trial did not participate in the provocative act, he or she is nevertheless vicariously liable for the surviving accomplice's conduct and may be convicted of murder in the death of the accomplice who is killed. A third is whether the decedent caused his own demise by engaging in provocative conduct." (*Ibid.*, fn. omitted.) To incur liability, "the provocative act of [a] defendant or . . . cofelon must be a substantial factor in the killing." (*Id.* at p. 123.)

Here, Shamis argues Perez caused his own death by getting into the car knowing the intent of the driver and others was to drive onto the freeway and stage an accident with a big-rig truck. Although Perez's act of getting into the car contributed to his death, it was far from the only cause. Amaya's conduct in driving onto the freeway and leading another car to a position immediately in front of a big-rig truck, then putting on the brakes was life-endangering, provocative conduct which substantially contributed to Perez's death. In addition, Sanchez, who, while following Amaya, drove erratically, maneuvered his car immediately in front of the big-rig, then slammed on his brakes, intentionally committed a life threatening act which was a substantial factor in the killing of Perez. It was Sanchez's and Amaya's conduct which caused the big-rig's driver to lose control of the vehicle, the truck to jackknife, and the trailer to fall onto the car. Shamis is criminally responsible for Amaya's and Sanchez's actions. As such, Shamis may be held to answer for Perez's murder.

## DISPOSITION

Let a peremptory writ of mandate issue commanding respondent superior court to vacate its order of April 8, 1997, dismissing as to real party in interest Elena Shamis counts one (murder, Pen. Code, § 187) and seventeen (insurance fraud, Ins. Code, § 1871.4, subd. (a)(3)) of the information, and enter a new and different order reinstating the charges and denying the

motion to dismiss the information as to those counts. The stay issued by this court on June 23, 1997, is vacated.

Klein, P. J., and Croskey, J., concurred.

Petitioner's application for review by the Supreme Court was denied February 3, 1998.