Filed 6/5/13  P. v. Morones CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JUAN MORONES,<br><br>    Defendant and Appellant. | D061505<br><br>(Super. Ct. No. SCS245331) |

APPEAL from a judgment of the Superior Court of San Diego County, Frank A. Brown, Judge.  Affirmed as modified.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L Garland, Assistant Attorney General, Peter Quon, Jr., and Theodore M. Cropley, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Juan Morones of conspiracy to commit murder (Pen. Code, § 182/187, subd. (a))[1] and found true the allegation the crime was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1). However, the jury acquitted Morones of the remaining counts charged in the information, including a count charging him with solicitation of murder (§ 653f, subd. (b)). After the court, in a bifurcated proceeding, found true the allegations that he had suffered numerous prior strike convictions (§ 667, subds. (b)-(i)), it sentenced Morones to an indeterminate term of 85 years to life plus a determinate term of 10 years.

On appeal, Morones contends the evidence is insufficient to support the conspiracy conviction because there was insufficient evidence he harbored the requisite intent to kill the victim. He also contends the conspiracy conviction must be reversed because his acquittal of the count charging him with solicitation of murder, one of the overt acts charged in the conspiracy count, necessarily represents a not true finding on the conspiracy count. Morones also asks this court to review de novo certain so-called *Pitchess*[2] materials and to determine whether the trial court's ruling on his *Pitchess* motion was an abuse of discretion. Morones also contends the court erred when it imposed a consecutive 10-year determinate term for the gang allegation as part of his sentence. The People concede this was error and that term must be stricken.

---

[1]    All further statutory references are to the Penal Code unless otherwise specified.

[2]    *Pitchess* v. *Superior Court* (1974) 11 Cal.3d 531.

# I

## FACTUAL BACKGROUND

On July 5, 2010, Victoriano Ortiz, an inmate at Donovan State Prison (Donovan), was walking in a prison yard with two allies, Mr. Polina ("Blue") and Mr. Gonzalez ("Stomper"). Blue suddenly turned on Ortiz and attacked him. Numerous other inmates quickly joined the assault on Ortiz, while other inmates attacked Stomper. The prosecution's theory was that the attack was the denouement of a power struggle between two rival factions of the Mexican Mafia then competing for control of Donovan, one of which was led by Ortiz and his "mesa," and the other led by a "mesa" composed of Mr. Garcia, Morones, and two others. The Mexican Mafia seeks to control prisons using "mesas" as a command system, which is in effect a governing council. Ordinarily, the chief of the mesa is a "shot-caller" or "key-holder," and he has two or three "helpers" to help run various aspects or areas of the prison, and the shot-caller and his helpers comprise the mesa. He derives his authority to run the prison from a "member" of the Mexican Mafia.

### A. The Principal Participants

Morones was an associate in the Mexican Mafia serving a life sentence at Donovan. His eventual ally, Mr. Garcia, is also an active Mexican Mafia associate. Ortiz testified about the structure of the Mexican Mafia. At the bottom of the pyramid are "southsiders," all members of Hispanic street gangs in southern California. These gang members must remit "taxes" (a portion of the proceeds of their illegal activity) to the Mexican Mafia. The next higher level are "surenos" or "soldiers," gang members who

3

have garnered authority and more respect than southsiders by working for the Mexican Mafia, through collecting taxes or enforcing orders through violent attacks. There are also "associates," who have worked their way up and are close to "members" of the Mexican Mafia (also referred to as "carnals"). At the top of the pyramid are the carnals, who can order someone killed or assaulted (also called "giving the green light") if the target is not respecting the authority of the Mexican Mafia. Such an order must be followed by all persons within the structure. Orders to attack someone, when issued by the mesa operating under a carnal's authority to run a prison, must be treated with the same obedience.

Ortiz was an associate in the Mexican Mafia and was incarcerated at Donovan to serve time for an assault he committed on its behalf. Ortiz believed his authority to run Donovan derived from his association with and permission from Richard Buchanon.

B. The Power Struggle Over Donovan

Ortiz arrived at Donovan in March 2010 and almost immediately sent out word, through "kites" and word of mouth, that he was now in charge of Donovan and whoever was in charge needed to step down or risk being assaulted. "Kites" are small handwritten notes by which messages can surreptitiously be passed to other inmates within the prison (either between cells within a cell block or even between cell blocks) or to persons outside the prison. Ortiz also formed his mesa, which included Stomper (Ortiz's right-hand man), an inmate named "Pino," and Morones. At one point, Morones asked Ortiz for paperwork containing Ortiz's authority, but Buchanon had verbally authorized Ortiz to run Donovan.

Another group apparently disagreed with Ortiz's attempt to exert control, and Ortiz believed this group was trying to challenge his authority. The group included Morones, who had been in a dispute with Stomper, and Mr. Franco (Casper). That group began sending kites asserting its authority to run Donovan, which those in the group believed was derived from another carnal, and included messages to Ortiz that Ortiz "had something coming." When Ortiz noticed southsiders were beginning to follow Morones's group, he tried to reassert his authority because there can only be one mesa running a prison. Ortiz's efforts to regain control included writing a kite to Morones asking to resolve the power struggle (an offer that did not bear fruit), and challenging Casper to a fight, which Casper declined. Ortiz interpreted Casper's response as acquiescing to Ortiz's authority, and he sent a kite to Casper indicating they were both now working under Buchanon's authority. Ortiz formed a new mesa, including Stomper, Blue and Mr. Ballesteros (Lazy). For the next month, everything appeared calm with Ortiz in control.

However, in late June or early July, problems over control reemerged after a carnal (Rudy Esputo) was temporarily incarcerated at Donovan. Esputo gave authority over Donovan to Morones, Morons' cellmate (Garcia) and two other inmates (Casper and an inmate with the moniker "Oso"). Almost immediately, Garcia began yelling on the tier of their cell block that he had "authority" and threatened that Ortiz and Stomper had "something coming," which Ortiz understood to mean he was targeted for attack. Ortiz also saw kites written by Garcia and Morones ordering Ortiz be "whacked" with "no exceptions."

5

Authorities had placed Garcia in a cell that was surreptitiously "wired" and, during this period, numerous recordings were made of conversations between Morones and Garcia, as well as conversations they had with other inmates. In some of the recordings from July 2, 2010 (three days before the attack on Ortiz and Stomper), Morones had already begun writing a kite to Lazy when Garcia began contributing to the kite. Garcia told Morones to ensure that the kite declare Esparto's direct orders had established the new mesa, and the new mesa was ordering both Lazy and Blue (members of Ortiz's inner circle) to "[whack] [Ortiz and Stomper] on this next yard no exceptions," and later discussing that the kite had been delivered.

When Ortiz went to walk in the prison yard on July 5, 2010, he knew he was risking his safety because there was a chance he would be assaulted. However, he believed he still had authorization to run Donovan, and could not show fear, so he nevertheless went into the yard. As Ortiz was walking with two of his allies (Blue and Stomper), Blue suddenly turned on Ortiz and began punching and cutting at him. Other inmates joined in the attack on Ortiz while yet another group of inmates attacked Stomper. Although correctional officers responded by ordering the inmates to get down, and thereafter by firing some shots when the inmates ignored the command, the attackers did not immediately cease but instead continued stabbing Ortiz and banging his head against a wall. Ortiz suffered head and other injuries from the attack.

II

ANALYSIS

A. Sufficiency of the Evidence

Morones contends the evidence was insufficient to support the conspiracy conviction. He does not contend the evidence was insufficient to show there *was* a conspiracy directed at trying to kill Ortiz; instead, he asserts the evidence was insufficient to show *he* was among those who agreed to the object of the conspiracy or that *he* intended that Ortiz be killed. Although Morones concedes the evidence showed Garcia and others agreed to (and did) try to kill Ortiz, Morones argues the only evidence against him was that he knew of Garcia's plan and acted as a mere scrivener for him, and asserts that no reasonable trier of fact could conclude he agreed to the object of the conspiracy or intended Ortiz be killed.

*Legal Principles*

When the sufficiency of the evidence is challenged, the court is not required to " ' "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation omitted.] Instead the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) "In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court 'must . . . presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.] The court does not, however,

7

limit its review to the evidence favorable to the respondent. . . . '[O]ur task . . . is twofold. First, we must resolve the issue in the light of the *whole record*--i.e., the entire picture of the defendant put before the jury--and may not limit our appraisal to isolated bits of evidence selected by the respondent. Second, we must judge whether the evidence of each of the essential elements . . . is *substantial;* it is not enough for the respondent simply to point to "some" evidence supporting the finding, for "[n]ot every surface conflict of evidence remains substantial in the light of other facts." ' " (*Id*. at pp. 576-577.)

"The standard of review is the same in cases such as this where the [prosecution relies] primarily on circumstantial evidence. [Citation.] 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.)

"A conspiracy is an agreement between two or more people to commit a public offense. [Citation.] A conviction for such requires proof of: (1) an agreement; (2) the specific intent to conspire; (3) the specific intent to commit the offense; and (4) an overt act towards achievement of that goal. [Citation.] These elements are sufficiently met by circumstantial evidence. . . . [¶] The overt acts charged as part of the conspiracy can be

8

circumstantial evidence of its existence. ' "Such acts may establish the purpose and intent of the conspiracy and relate back to the agreement whose purpose may be otherwise enshrouded in the hush-hush admonitions of the conspirators." ' " (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1464, disapproved on other grounds by *People v. Mesa* (2012) 54 Cal.4th 191, 199.) A defendant may be convicted of a criminal conspiracy if there is evidence the defendant and one or more persons had the specific intent to agree to commit an offense and to commit the elements of the offense, and one of the conspirators committed some overt act in furtherance of the conspiracy. (*People v. Morante* (1999) 20 Cal.4th 403, 416.) The overt act need not be a criminal offense, nor must it be committed by the defendant. (*Id*. at p. 417; *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1708.)

Evidence is sufficient to prove criminal conspiracy " 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135.) Intent to agree to commit a crime is usually established through circumstantial evidence, and proof of an express or formal agreement is not required. (*People v. Austin* (1994) 23 Cal.App.4th 1596, 1606, disapproved on other grounds by *People v. Palmer* (2001) 24 Cal.4th 856, 861, 867.)

Although mere association does not prove a criminal conspiracy (*People v. Manson* (1976) 61 Cal.App.3d 102, 126), "common gang membership may be part of

9

circumstantial evidence supporting the inference of a conspiracy. [Citation.] The circumstances from which a conspiratorial agreement may be inferred include 'the conduct of defendants in mutually carrying out a common illegal purpose, the nature of the act done, the relationship of the parties [and] the interests of the alleged conspirators . . . .' " (*People v. Superior Court* (*Quinteros*) (1993) 13 Cal.App.4th 12, 20-21; compare *U.S. v. Garcia* (9th Cir. 1998) 151 F.3d 1243, 1244 [gang membership *by itself* is insufficient to prove a gang member's agreement to commit a crime].) Similarly, although evidence a defendant performed some act that furthered another person's illegal purpose is not by itself sufficient to prove the defendant was a member of a conspiracy to accomplish that illegal purpose, a rational trier of fact may infer the requisite agreement when there is evidence the defendant performed an act that furthered the other person's illegal purpose while *knowing* of that person's illegal purpose. (Cf. *People v. Austin, supra,* 23 Cal.App.4th at p. 1607.)

*Application*

We are convinced there was substantial evidence from which a reasonable trier of fact could have concluded Morones agreed to the object of the conspiracy and specifically intended the target crime would be committed. There was evidence of motive: Morones was part of the mesa authorized by carnal Esputo to run Donovan, Ortiz's claim of a competing authorization (which Morones had asked Ortiz to prove) was undocumented, and a trier of fact could infer that Morones viewed Ortiz as a usurper. Moreover, in the recordings taken from his cell shortly before the assault, played for the jury during trial, he was overheard discussing with Casper whether he (Morones) should

10

tell other inmates (Blue and Lazy) that they would be exempted from the coming retribution, and telling Casper he tried to warn others that Ortiz was a usurper and they should not follow him but should instead "follow my lead [and] step back" because "shit is going to fall in the place it is supposed to fall." This evidence permitted a reasonable trier of fact to infer Morones already knew of the impending attack, and agreed to it because that was how "it is supposed to fall," and intended the attack to be successful because he tried to explain to potential allies of Ortiz why they should not come to Ortiz's assistance. In another recording, made about two to three hours later, Garcia asked Morones to whom he was writing and, when Morones told him the kite was for Lazy, he told Morones to include in his missive that the new mesa was on direct orders from carnal Esputo, and Ortiz and Stomper were to be "[whacked] on this next yard[,] no exceptions." A reasonable jury could infer that Morons' willingness to include Garcia's instructions in his kite was because he agreed to the attack and intended it to succeed.

The following day, Morones is overheard questioning why Ortiz "doesn't come out," and Garcia reassured Morones that Ortiz was "on group crew, but that's a good thing . . . that way we can blast the fuck out of him." A reasonable jury could infer that Morones asked about the mechanics of the attack because he was supportive of its goals. Finally, in the morning on the day of the attack, Morones is overheard expressing doubts whether others will follow the commands: he explained to Garcia that he "just went through it" and, while Garcia "make[s] it seem so easy," it's not easy because "you're waiting for the alarm, you're waiting for the alarm . . . . You look like an idiot," and a minute later Morones bemoans that "when we had the chance to, we fucken blew it,"

11

which forced him to try "to get bed moves." A few minutes later, Garcia reassures Morones that "some people fail, some people don't . . . and 'cause some people don't succeed doesn't make them . . . bad," and Morones responds, "I know." A reasonable jury could infer that Morones, having agreed to help organize the attack with the intent it succeed, was sharing his anxiety with Garcia that their common goal might not be achieved because Morones had personal experience with a previous aborted effort, but nevertheless tells Garcia, "I will like to see how this comes down."

Morones contends on appeal that this evidence is capable of a different and more benign interpretation: that he was merely engaged in a charade and acting as though he agreed to the plan and was following the orders of Garcia to issue the kite ordering the attack out of an understandable desire for self-preservation. However, this argument at bottom asserts that, even though Morones's words and deeds made it *appear* to observers as though he agreed to the goals of the conspiracy and intended its object to succeed, no reasonable trier of fact could have found that his outward appearances were reflective of his *true* subjective intentions. This argument was presented to the trier of fact, and the jury rejected that interpretation of the evidence. Because the subjective intentions of a defendant are peculiarly within the province of the trier of fact to determine (see, e.g., *Begnal v. Canfield & Associates, Inc.* (2000) 78 Cal.App.4th 66, 77 [" ' "[D]eterminations regarding motivation and intent depend on complicated inferences from the evidence and are therefore peculiarly within the province of the factfinder." ' "]), we may not reverse its verdict merely because the jury, rejecting Morones's arguments, found his subjective intentions accorded with outward appearances.

12

B. <u>The Inconsistent Verdict Claim</u>

Morones alternatively contends the conspiracy conviction must be reversed because it was based on the same overt act (writing the so-called "murder kite") that underlay another count charging him with solicitation of murder under section 653f, subdivision (b), on which he was acquitted. Morones acknowledges the law generally accepts inconsistent verdicts but asserts that, under the limited judicial exception applicable in conspiracy cases, the acquittal of the solicitation count is a not true finding on the overt act required for conspiracy, and therefore he should be deemed acquitted of the conspiracy count.

*Legal Principles*

"Prior to 1927, appellate courts of this state . . . held that inconsistent verdicts 'would not support a judgment of conviction.' [Citations.] In apparent response to these decisions, the Legislature amended section 954 in 1927, adding the last sentence of the section, which now provides: 'An acquittal of one or more counts shall not be deemed an acquittal of any other count.' [Citations.] . . . [¶] Since 1927 our courts have followed the general rule and viewed an inconsistent acquittal as the product of confusion or an act of mercy on the part of the jury, of which an appellant is not permitted to take further advantage." (*People v. Pahl* (1991) 226 Cal.App.3d 1651, 1656-1657 (*Pahl*); see *People v. Santamaria* (1994) 8 Cal.4th 903, 911 ["It is . . . settled that an inherently inconsistent verdict is allowed to stand; if an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both."].) As

13

*Pahl* explained, "The question of the validity of inconsistent verdicts usually arises when a jury renders two verdicts on two different counts which are contradictory. [Citation.] Understandably, in such cases defendants . . . take the position that the acquittal is the legally correct verdict while the conviction is not. This argument has been universally rejected because inconsistent verdicts are probably the result of compromise in the jury room or of an extension of leniency or mercy to the defendant. [Citation.] In other words, if the conviction is supported by substantial evidence, it is valid because the defendant 'had the benefit of the jury's compassion, rather than suffering a burden because of its passion . . . .' " (*Pahl*, at p. 1656.)

However, relying on the limited judicial exception to this rule established by our Supreme Court in *In re Johnston* (1935) 3 Cal.2d 32, 34-36, applicable in conspiracy cases, Morones argues he falls within the *Johnston* exception. We conclude that, even assuming the *Johnston* rule remains available to defendants,[3] Morones does not fall

---

3      Although it is unnecessary in this case definitively to determine whether the *Johnston* exception remains available, we note the United States Supreme Court ruled in *U.S. v. Powell* (1984) 469 U.S. 57 that allegedly inconsistent verdicts in conspiracy cases were permissible. Subsequent to *Powell*, our Supreme Court in *People v. Palmer, supra,* 24 Cal.4th 856 again considered the requirement for consistency in conspiracy cases. Relying heavily on the analysis in *Powell* (see *Palmer,* at pp. 863-864), our Supreme Court concluded the limited judicial exception of *Johnston* "is a vestige of the past with no continuing validity. Many reasons may explain apparently inconsistent verdicts: lenience, compromise, differing evidence as to different defendants, or, possibly, that two juries simply viewed similar evidence differently. If substantial evidence supports a jury verdict as to one defendant, that verdict may stand despite an apparently inconsistent verdict as to another defendant." (*Palmer,* at p. 858; accord, *People v. Abilez* (2007) 41 Cal.4th 472, 512-513 [" ' "It is . . . settled that an inherently inconsistent verdict is allowed to stand; if an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a

within its parameters. "The conspiracy exception is limited, applying only where, as in *Johnston,* an overt act alleged in a conspiracy charge is *identical* to another charged offense of which defendant is acquitted. The Supreme Court decreed that under those unique circumstances, section 954 should not be construed to support a judgment of conviction for conspiracy, because the defendant has been acquitted of *every* charged overt act." (*Pahl, supra,* 226 Cal.App.3d at p. 1658, italics added.)

As the italicized language reveals, the *Johnston* exception to the rule against attacking inconsistent verdicts exists in conspiracy cases only when the overt act alleged in the conspiracy charge is identical to the other charged offense of which the defendant is acquitted. (*Pahl, supra,* 226 Cal.App.3d 1651.) However, where the conspiracy count alleges overt acts other than (or in addition to) the act constituting the substantive offense charged in another count, there is no inconsistency in convicting the defendant of conspiracy while acquitting him of the substantive offense. (*People v. Eberhardt* (1985) 169 Cal.App.3d 292, 297.) Alternatively, when the overt act forming the basis of the conspiracy count is *dissimilar* to the other substantive offense upon which a defendant is

conviction of a substantive offense, effect is given to both." ' "].) Although *Palmer* involved a different factual scenario than present here, because the defendant in *Palmer* argued the acquittal of his coconspirator required reversal of his conviction for conspiracy (*Palmer,* at p. 866), and Morones here contends the inconsistent verdict stems not from the acquittal of a coconspirator but from his acquittal on a charge that assertedly also formed the overt act for the conspiracy count, the decisions in *Powell* and *Albilez* suggest this is a distinction without a difference. Indeed, the only recent authority cited by Morones for the continuing vitality of the *Johnston* rule is *Akhlaghi v. Superior Court* (2008) 161 Cal.App.4th 561. Although *Akhlaghi* was decided after *Palmer* and *Labile*, the *Akhlaghi* decision makes no mention of *Powell*, *Palmer* or *Albilez* and is therefore of questionable validity. We need not further address this issue because we are convinced *Johnston* would have no application even if it survived *Powell*, *Palmer* and *Albilez.*

15

acquitted, and the acquittal of the substantive offense could have been based on elements not necessarily requiring a not true finding as to the overt act, the acquittal of the substantive offense does not operate as an acquittal of the conspiracy count. (See, e.g., *People v. Witt* (1975) 53 Cal.App.3d 154, 168.) For example, in *Witt*, the defendant was charged with forgery of a will and conspiracy to defraud an estate; the trial court dismissed the forgery charge after the prosecution rested but the jury convicted defendant of the conspiracy charge. (*Id.* at pp. 167-168.) The *Witt* court rejected the application of *Johnston* because (1) the overt act proven was predicated on the defendant's going to a store and causing the store owner to type the will (rather than on the act of forgery itself), and (2) the defendants were not acquitted for lack of proof that they committed the crime of forgery but instead because the prosecution failed to show the offense occurred in Tulare County. (*Witt,* at pp. 167-168.)

Applying these authorities here, the "limited judicial exception" under *Johnston* does not apply. The count on which Morones was acquitted was solicitation of murder in violation of section 653f, subdivision (b). That offense required proof that (1) Morones requested or directed another person to commit the crime of murder, (2) he intended the crime be committed, and (3) his communication containing the request or direction was received by the other person. (See, e.g., *People v. Saephanh* (2000) 80 Cal.App.4th 451, 458-459.) In contrast, the overt act alleged in this case was that "[Garcia] told his [cellmate, Morones], to write an inmate message ('Kite') to have [Ortiz and Stomper] murdered immediately ('whacked'). GARCIA told MORONES to write the following: '[Ortiz], Stomper . . . are to be whacked on the next yard ASAP. No exceptions. Direct

16

orders from the Carnal.' "  The overt act was *not* the alleged *writing* containing the request, as required by the first element in the solicitation count; instead, the overt act was Garcia's *statement* directing Morones to *make* the alleged writing.  Moreover, even assuming those distinct acts could be deemed co-extensive, a jury could have acquitted Morones of the solicitation count if it concluded a distinct element of proof (e.g. the communication containing the request or direction was *received* by the other person) had not been shown beyond a reasonable doubt, even if it were convinced the overt act had occurred.  Under the analysis of *People v. Witt, supra,* 53 Cal.App.3d 154, either potentiality precludes application of *Johnston*.

Finally, even assuming the foregoing obstacles to application of *Johnston* could be overcome, Morones's argument falters because there were four overt acts alleged by the information, any one of which would suffice for the conspiracy conviction.  As explained in *People v. Robinson* (1954) 43 Cal.2d 132, 138:

> "It is only when the substantive offense charged is alleged to be the *only* overt act in furtherance of the conspiracy that an acquittal of the substantive offense operates as an acquittal of the conspiracy count based solely thereon.  Thus, where the conspiracy count alleged as the only overt acts the specifically described crimes set forth in the other counts, and defendant was found not guilty of any of these specific crimes, there could be no conviction of the alleged conspiracy because no overt acts had been proved.  [Citations.]  But where there are overt acts alleged in the conspiracy count in addition to those constituting the substantive offense, there may be a conviction of conspiracy and an acquittal of the substantive offense.  Such a conviction and acquittal have been held not to be inconsistent."

The analysis in *Robinson* is controlling.  In *Robinson*, count one of the information charged the appellant and a Mr. Schaefer with conspiracy to engage in bookmaking; five

overt acts in pursuance of the conspiracy were alleged, four of which were committed by Schaefer alone (involving accepting bets and collecting money from a bettor), and the fifth was that Schaefer turned the money over to the defendant on October 24, 1952. Count two of the information charged the defendant with bookmaking because Schaefer turned the funds over to the defendant on October 24, 1952. (*People v. Robinson, supra,* 43 Cal.2d at pp. 138-139.) The defendant, after being acquitted on count two but convicted of the conspiracy, argued the acquittal on count two necessarily absolved him under *Johnston* of the conspiracy count because he was acquitted of the only overt act charged against him in the conspiracy count. The *Robinson* court, rejecting that argument, explained:

> "The undisputed evidence of the four overt acts committed by Schaefer would be sufficient to sustain the conspiracy conviction against appellant, once the latter's alleged connection with the conspiracy was shown. . . . [Citations.] [It is not] necessary that the purpose of the conspiracy be fully accomplished [citations] or that each conspirator perform some overt act. It is sufficient if one conspirator commits an overt act in carrying out the purpose of the conspiracy, for all the members thereof 'are bound by all acts of all members done in furtherance of the agreed plot.' [Citations.] In view of the evidence that Schaefer committed the first four alleged overt acts pursuant to the conspiracy, which overt acts were additional to the acts alleged against appellant in count two, it cannot be said that the verdict of guilty on count one is inconsistent with the verdict of not guilty on count two." (*Id*. at pp. 139-140.)

*Robinson* is directly analogous and controls this case. As in *Robinson*, Morones was charged with participating in a conspiracy, and multiple overt acts (only one of which directly involved Morones) were alleged. As in *Robinson*, Morones was charged with, but acquitted of, an additional count that arguably encompassed an evidentiary

18

overlap with the only overt act alleged against Morones as part of the conspiracy count. We follow *Robinson* and conclude the evidence that other persons committed the other alleged overt acts pursuant to the conspiracy, which overt acts were additional to the acts alleged against appellant in count two, precludes us from concluding the guilty verdict on the conspiracy count is irreconcilable with the verdict of not guilty on the solicitation count.

### C. The *Pitchess* Motion

Morones requests that this court review the trial court's denial of any discovery pursuant to his *Pitchess* motion. In the trial court, Morones filed a *Pitchess* motion in which he sought discovery of the personnel records for agent Epperson, including records regarding the truthfulness of his reports. The Attorney General opposed the motion. The trial court conducted an in camera review of the personnel records (see *Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1019 ["[i]f the trial court finds good cause for the discovery, it reviews the pertinent documents in chambers and discloses only that information falling within the statutorily defined standards of relevance"]) and, after reviewing the personnel records in camera, ruled there were no discoverable records in the file.

On appeal, this court is required to examine the materials in camera and determine whether the trial court abused its discretion in refusing to disclose the contents of the officers' personnel files. (*People v. Hughes* (2002) 27 Cal.4th 287, 330; *People v. Mooc* (2001) 26 Cal.4th 1216, 1229.) We have examined the personnel records in camera and conclude the trial court did not err in its ruling on Morones's *Pitchess* motion.

19

DISPOSITION

The court on remand shall strike the 10-year determinate term for the gang allegation appended to count one; as so modified, the judgment is affirmed.


McDONALD, J.

WE CONCUR:

McCONNELL, P. J.

McINTYRE, J.