Filed 6/29/26  P. v. Caldwell CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ISIAH EUGENE CALDWELL, JR.,<br><br>Defendant and Appellant. | B339972<br><br>(Los Angeles County Super. Ct. No. SA105967) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lauren Weis Birnstein, Judge.  Reversed and remanded with directions.

Linda L. Gordon, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Isiah Caldwell appeals after a jury found him guilty of conspiracy to commit assault with a firearm (Pen. Code, § 182, subd. (a)(1))[1] and found true allegations that he personally used a firearm in the commission of the offense (§ 12022.5, subd. (a)) and had a prior felony juvenile adjudication that qualified as a strike.  The trial court found true several factors in aggravation (Cal. Rules of Court, rule 4.421)[2] and sentenced defendant to 18 years in prison.

On appeal, defendant contends insufficient evidence supports his conspiracy conviction and the true finding on the firearm use allegation.  Defendant also contends, and the People concede, that he had the right to a jury trial on the factors in aggravation.  Finally, defendant requests this court conduct an independent review of the materials the trial court reviewed during an in camera hearing held pursuant to *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) and *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

We find that substantial evidence supports defendant's conviction of conspiracy to commit assault with a firearm and the true finding on the personal firearm use allegation.  We agree that defendant was entitled to a jury trial on the factors in aggravation and that the error was prejudicial, necessitating reversal for possible retrial on those factors.  We find no abuse of discretion in the trial court's *Brady/Pitchess* rulings.

## BACKGROUND

Defendant's conviction of conspiracy stemmed from an incident on December 1, 2020 at the Venice Beach Boardwalk that resulted in the death of Ky Thomas, who was shot in the chest.  At trial, the primary issue was the identity of the shooter.  The prosecution's theory was that defendant was the shooter, but the jury found defendant not guilty of Thomas's murder.

### A.    Eyewitness Testimony

On December 1, 2020, Thomas and her husband, Stephen Nobles, went to the Venice Beach Boardwalk.  They were accompanied by Thomas's sister, Kamryn Saltus, and Saltus's boyfriend, Demetrius Powell.

---

[1]    Unspecified section references are to the Penal Code.

[2]    Unspecified rule references are to the California Rules of Court.

The two couples rented electric scooters and bicycles from Star Bike Rentals, leaving a credit card and Saltus's identification as a deposit. They rode to Malibu and back, but on the return trip the scooter batteries died. They called the phone number Star Bike Rentals had provided, but it was disconnected. The two women took an Uber back to Star Bike Rentals, leaving the scooters where they had died, while the men rode the bicycles back.

Nadav Vaizman was working at Star Bike Rentals that day. Vaizman refused to return Saltus's credit card and identification before the scooters were returned. The couples got angry with Vaizman, who called his manager to ask for help. Vaizman also appeared to be texting someone.

The manager of Star Bike Rentals soon arrived and tried to calm things down. Eventually, Saltus took her credit card and identification back. The couples then went outside near a bench.

About three to five minutes later, a group of five or six men arrived. One or more of the men went into Star Bike Rentals. Vaizman said, "They're outside – outside on the bench" or "Outside."

The group of men then approached the two couples, who were still outside. Saltus saw that all of the men had guns, and one of them pointed the laser sight of a gun at her. Powell likewise saw multiple people holding guns.

One of the men asked the couples, "Where are you from?" The couples responded, "Nowhere. However, Powell had been a member of the Pasadena Denver Lane Bloods (PDLB) gang in the past and had "Pasadena" tattooed on his forearm, and Nobles had grown up in the PDLB neighborhood and had at least one PDLB tattoo.

One of the five or six men said, "They're not tripping." The men started walking away. Then, one of the men started shooting at the couples. Witnesses heard six shots. The police recovered four .380 casings fired from the same gun. As noted above, Thomas was killed in the shooting, which occurred at 5:23 p.m.

Saltus told the police that the shooter was wearing a navy sweatsuit and was five feet six inches to five feet seven inches tall. She also described a young, scrawny person, later identified as D'Aire J., who had pointed a gun

with a laser at her. Saltus told the police that the person who asked "where are you from" was a man in a striped shirt who was "chubbier than the others."

At trial, Saltus identified defendant as the shooter and testified that he was also the person who had asked the couples "where are you from." Both Powell and Nobles claimed not to remember anything about the incident, although Nobles testified that defendant was not the shooter.

### B.   Investigation

Cell phone records showed that at 5:13 p.m. on the day of the shooting, Vaizman had texted "WYA," meaning, "where you at," to Jonathan Singh. At 5:15 p.m., Singh called Vaizman.

Surveillance video showed that at 5:16 p.m. – within a minute of the call, four vehicles traveled "in tandem" from Oakwood Park, in territory claimed by the Venice Shoreline Crips (VSC) gang, to a parking lot near the site of the shooting.

The four vehicles arrived at the parking lot at 5:21 p.m. Singh and D'Aire J. exited from one vehicle. Defendant and another male exited from a second vehicle. An unknown male exited from the third vehicle. After those five males walked toward the boardwalk, a sixth, unknown male exited from the fourth vehicle. At least two of the males could be seen carrying guns. After the shooting, some of the males returned to the parking lot, including defendant, who was holding his waistband in a manner suggesting he had a firearm.

Singh subsequently made incriminating statements to an undercover agent in jail. Singh expressed concern that the "kid" at the bike rental store had provided information to the police. Singh stated that all of the males in his group had been armed with firearms and that the shooting was "some gang shit."

Singh's cell phone contained photos of Singh at Oakwood Park wearing gang clothing and throwing gang signs. Defendant had tattoos indicating he was a member of the VSC. Social media posts showed defendant in gang attire and in the company of other members of the VSC, including at Oakwood Park. Defendant had previously admitted being a member of VSC.

4

A gang expert testified that asking "where you from" is a common gang challenge that is typically followed by an "act of violence."

## C. Charges, Verdicts, and Sentencing

Defendant was charged with the murder of Thomas (count 1; § 187, subd. (a)), the attempted murder of Nobles (count 2; §§ 664, 187, subd. (a)), and conspiracy to commit assault with a firearm (count 3; §§ 182, subd. (a), 245, subd. (a)(2)).  Personal firearm use allegations (§ 12022.5, subd. (a)) were attached to counts 1, 2, and 3.  Also as to all three counts, it was alleged that a principal was armed with a firearm (§ 12022, subd. (a)(1)).  It was alleged that defendant suffered a prior juvenile adjudication that qualified as a strike (§ 667, subds. (b)-(j), § 1170. 12) and that there were nine factors in aggravation under Rule 4.421.

The jury found defendant not guilty of murder (count 1) and attempted murder (count 2) but convicted him of conspiracy to commit assault with a firearm (count 3).  The jury found true the personal firearm use allegation associated with count 3, and the strike allegation.

The trial court found true several factors in aggravation under rule 4.421 and sentenced defendant to 18 years in prison:  the upper term of four years for conspiracy, doubled to eight years pursuant to the Three Strikes Law, with a consecutive 10-year upper term for the firearm use enhancement.

## DISCUSSION

## A. Sufficiency of the Evidence: Conspiracy

Defendant contends insufficient evidence supports his conviction of conspiracy to commit assault with a firearm.  Specifically, he claims there is no substantial evidence that he intended to agree to participate in a conspiracy to commit assault with a firearm.

"The standard of appellate review for determining the sufficiency of the evidence is settled.  '"On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]'" [Citation.]" (*People v. Wilson* (2008) 44 Cal.4th 758, 806 (*Wilson*).)

5

"Conspiracy "'is an inchoate offense, the essence of which is an agreement to commit an unlawful act.'" [Citation.] This crime has four elements: (1) the existence of an agreement between at least two persons; (2) the specific intent to agree to commit an offense; (3) the specific intent to commit the offense that is the object of the agreement; and (4) an overt act in furtherance of the conspiracy, which may be committed by any conspirator. [Citations.]" (*People v. Ware* (2022) 14 Cal.5th 151, 163 (*Ware*).)

"To establish the requisite specific intent connecting an individual defendant to the charged conspiracy, the prosecution must show that the defendant intended to play some part in achieving the conspirator's unlawful ends. Put differently, '[t]here must be something more than "[m]ere knowledge, approval of or acquiescence in the object or the purpose of the conspiracy."' [Citations.]" (*Ware, supra,* 14 Cal.5th at p. 166.)

"'Evidence is sufficient to prove a conspiracy to commit a crime "if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy."' [Citations.]" (*People v. Maciel* (2013) 57 Cal.4th 482, 515-516.) "[C]ommon gang membership may be part of circumstantial evidence supporting the inference of a conspiracy. [Citation.]" (*People v. Superior Court (Quinteros)* (1993) 13 Cal.App.4th 12, 20 (*Quinteros*).)

Here, there was substantial circumstantial evidence of defendant's intentional agreement to commit an assault with a firearm. About 10 minutes before the shooting, Singh communicated with Vaizman, who had just been in a confrontation with the victims at Star Bike Rentals. Defendant drove to the Boardwalk "in tandem" with Singh and four other men. At the Boardwalk, defendant and the other men exited their cars and proceeded directly to Star Bike Rentals, all armed with firearms. At least one member of defendant's group went inside Star Bike Rentals and was directed to the couples outside near the bench. Defendant and the other men approached the couples with their firearms displayed. One member of defendant's group issued a gang challenge, asking "Where are you from?" Defendant and Singh were both members of the VSC gang, the victims were associated with a rival

6

gang, and the crime occurred in VSC territory. (See *Quinteros, supra,* 13 Cal.App.4th at p. 21.) Although there is no direct evidence that defendant, Singh, and the others discussed in advance the assault with a firearm, there was evidence that they were together near Oakwood Park shortly before the killing, "during which a discussion and agreement could have taken place." (See *People v. Jurado* (2006) 38 Cal.4th 72, 121.) Their subsequent conduct in travelling together to the Boardwalk and approaching the victims, armed with firearms, is circumstantial evidence that shows the existence of an agreement.

Defendant asserts that the evidence supported a finding that he was the person who said, "They're not tripping," and he claims this shows that he was attempting to "diffuse the situation" and not intending to "play any role in an assault with a firearm." This argument overlooks the fact that one of the people in defendant's group had already pointed a gun with a laser at Saltus, thereby completing an assault with a firearm. (See *People v. Hartsch* (2010) 49 Cal.4th 472, 507-508 ["pointing a gun at someone in a menacing manner" is an assault with a firearm].) Moreover, the evidence was disputed as to whether defendant was the person who said "They're not tripping," and the jury could have found that instead, defendant was the person who issued the gang challenge by asking, "Where are you from?"

In sum, substantial evidence supports defendant's conviction of conspiracy to commit assault with a firearm.

**B.     Sufficiency of the Evidence:  Personal Firearm Use**

Defendant contends insufficient evidence supports the jury's finding that he personally used a firearm in the commission of the conspiracy to commit assault with a firearm.

"We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction. [Citation.]" (*Wilson, supra,* 44 Cal.4th at p. 806.) "Proof of firearm use during a felony does not require a showing the defendant ever fired a weapon. 'Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct *which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies. . . .* 'Thus when a defendant

7

deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure. The defense may freely urge the jury not to draw such an inference, but a failure to actually point the gun, or to issue explicit threats of harm, does not entitle the defendant to a judicial exemption from section 12022.5[, subdivision] (a).' [Citations.]" (*Wilson, supra,* 44 Cal.4th at pp. 806-807, original italics.)

Evidence of defendant's firearm use came primarily from Powell and Saltus. Powell testified that he remembered being "approached with guns" by a "couple people." He claimed not to remember if the guns were being held inside of the people's pockets or outside of their pockets. Saltus testified that she saw that "all of" the men who approached had guns. The jury was entitled to find this testimony credible and could reasonably find, based on all the evidence, that defendant was one of the men in the group who had approached the group while deliberately holding a gun in a manner intended to intimidate the victims.

We reject defendant's suggestion that a question submitted during the jury's deliberations on the firearm use allegation shows the jury did not unanimously find that allegation true.[3] The jury asked, "How late can we stay today? Hypothetically, if we cannot come to an agreement on [the firearm use allegation], what happens?" The jury noted that one juror would be out of town starting the next day, and that another juror would be "gone" after that. Before the trial court could respond to the question, the jury reached its verdict on the firearm allegation. Defendant would have us speculate that the jury may have reached its verdict because it "felt pressured to come to a decision." We decline to do so.

---

[3] The jury deliberated on the firearm use allegation after returning its verdicts on the substantive offenses, because the original verdict form for count 3 did not include the firearm use allegation.

## C.     Factors in Aggravation

Defendant contends, and the People concede, that he had the right to a jury trial on the factors in aggravation, which the trial court found did not need to be submitted to the jury.

Nine factors in aggravation were originally alleged, including factors relating to the crime (rule 4.421(a)) and factors relating to defendant (rule 4.421(b)).  Based on then-valid case law, the trial court determined that the aggravating factors relating to defendant's prior convictions did not need to be presented to the jury.[4]  The trial court proceeded to find true three of those factors:  "The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness" (rule 4.421(b)(2); "The defendant has served a prior term in prison or county jail under section 1170(h)" (rule 4.421(b)(3)); and "The defendant was on probation, mandatory supervision, postrelease community supervision, or parole when the crime was committed" (rule 4.421(b)(4)).  At the sentencing hearing, the trial court also mentioned finding true a fourth aggravating factor:  "The defendant's prior performance on probation, mandatory supervision, postrelease community supervision, or parole was unsatisfactory" (rule 4.421(b)(5).

In *Wiley*, the Supreme Court considered the scope of the right to a jury trial on aggravating sentencing factors and the exception to this right for a defendant's prior convictions.  (*Wiley, supra*, 17 Cal.5th at 1076.)  The court recognized that, under the Sixth Amendment and section 1170, subdivision (b), "a defendant is entitled to a jury trial on all aggravating facts, other than the bare fact of a prior conviction and its elements, that expose the defendant to imposition of a sentence more serious than the statutorily provided midterm."  (*Wiley*, at p. 1086, fn. omitted.)  The court held that this right to a jury trial extends to the aggravating factor that a defendant's prior convictions were of "increasing seriousness."  (*Ibid*.)  It also extends to the aggravating factor that a defendant's prior performance on probation or parole was "unsatisfactory."  (*Id*. at p. 1083.)  Accordingly, absent a proper

---

[4]     The trial court cited to *People v. Pantaleon* (2023) 89 Cal.App.5th 932, which was later disapproved by *People v. Wiley* (2025) 17 Cal.5th 1069, 1086 (*Wiley*).

waiver or stipulation, a defendant is "entitled to have a jury determine whether his prior convictions were of increasing seriousness and whether he had performed unsatisfactorily on probation, before the court c[an] rely on those aggravating facts to find justification for an upper term sentence." (*Id.* at p. 1085.)

We apply the *Chapman* standard of review to determine if the error was prejudicial. (*Wiley, supra*, 17 Cal.5th at p. 1087; *People v. Lynch* (2024) 16 Cal.5th 730, 768 (*Lynch*).) A defendant "is entitled to a reversal and remand for resentencing unless, after examining the entire cause, including the evidence as to all relevant circumstances [citation], we can conclude that the omission of a jury trial was harmless beyond a reasonable doubt as to *every* aggravating fact the trial court used to justify an upper term sentence." (*Lynch*, at p. 775.) In conducting our examination, however, we must not "assume that the record reflects all of the evidence that would have been presented to the jury." (*Ibid.*)

In arguing prejudice, defendant focuses on the trial court's finding that his convictions were "numerous or of increasing seriousness" (rule 4.421(b)(2)). Respondent agrees that the lack of a jury trial on this factor cannot be found harmless.

The evidence presented to the trial court included certified documentation of a 2011 juvenile adjudication for robbery and attempted robbery. The trial court also considered a certified copy of defendant's rap sheet. Defendant's first adult conviction was in 2013, when he was convicted of felony attempted grand theft and sentenced to prison; that conviction was later reduced to a misdemeanor. In 2014, he was convicted of felony assault and placed on probation. In 2015, he was convicted of unlawful possession of a firearm and sentenced to prison. In 2017, he was convicted of misdemeanor destruction of evidence. And in 2020, he was convicted of grand theft and placed on probation.

We agree that on this record, a rational juror could find that defendant's juvenile adjudications and adult convictions were neither numerous nor of increasing seriousness. While a jury could certainly find the evidence of defendant's one juvenile adjudication and five adult convictions to be "numerous," we cannot conclude, beyond a reasonable doubt, that every

10

juror necessarily would have made such a finding. Similarly, defendant's criminal history does not necessarily "demonstrate[] a clear trend from less serious offenses towards more serious ones." (See *Wiley, supra,* 17 Cal.5th at p. 1089.) Therefore, the trial court's error in failing to submit the aggravating factors to the jury cannot be found harmless.

We will remand so the People may have an opportunity to retry the aggravating factors. (See *Lynch, supra,* 16 Cal.5th at p. 776.)

### D. *Brady/Pitchess* Motion

Before trial, defendant filed a *Brady/Pitchess* motion that sought information from the personnel files of 10 police officers – specifically, "prior instances of misconduct." The trial court granted the motion and reviewed materials provided by the custodians of records, during two in camera hearings.[5] Defendant requests this court conduct an independent review of the materials the trial court reviewed during those hearings.

"When a trial court concludes a defendant's *Pitchess* motion shows good cause for discovery of relevant evidence contained in a law enforcement officer's personnel files, the custodian of the records is obligated to bring to the trial court all 'potentially relevant' documents to permit the trial court to examine them for itself. [Citation.]" (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228-1229.) To permit "future appellate review," the trial court should "make a record of what documents it examined before ruling on the *Pitchess* motion." (*Id.* at p. 1229.) An appellate court reviews a trial court's disclosure decisions for abuse of discretion. (*Id.* at p. 1232.)

We have reviewed the sealed transcripts of the in camera hearings. The trial court did not abuse its discretion during its review of matters within the police officers' personnel files. The court properly conducted the *Pitchess* hearing and prepared a sufficiently detailed record for appellate review. The sealed personnel documents within the files, other than the complaints disclosed, were not subject to disclosure as they were not relevant to show officer misconduct. ( See *Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1019.) Likewise, the court properly found the personnel file

---

[5] Two different judges conducted the in camera hearings.

did not contain any evidence favorable to defendant's guilt or punishment. (*Brady*, *supra*, 373 U.S. at p. 87.)

## DISPOSITION

The judgment is reversed, and the matter is remanded with directions for the trial court to conduct further proceedings under section 1170, subdivision (b).

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COGLIATI, J.[*]


We concur:


ZUKIN, P. J.


MORI, J.

---

[*]      Judge of the Santa Cruz Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.