Filed 10/8/15  P. v. Madrigal CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANTONIO MADRIGAL,<br><br>    Defendant and Appellant. | 2d Crim. No. B254702<br>(Super. Ct. No. 2013023115)<br>(Ventura County) |

Antonio Madrigal appeals from the judgment following his conviction by jury of active participation in a criminal street gang (Pen. Code, § 186.22, subd. (a)[1] (count1)); assault by force likely to produce great bodily harm (§ 245, subd. (a)(4) (count 2)); and conspiracy to commit assault by force likely to produce great bodily harm (§ 182, subd. (a)(1) (count 3)).  The jury also found two criminal street gang allegations were true.  (§ 186.22, subd. (b)(1).)  In a bifurcated proceeding, appellant admitted that he had five prior strike convictions (§ 667, subds. (d)(1) & (e)(1)); a prior serious felony conviction (§ 667, subd. (a)(1)); and served two prior prison terms (§ 667.5, subd. (b)).  The trial court sentenced him to prison for 25 years to life plus 10 years.  Appellant contends that (1) there is not sufficient evidence to support his convictions; (2) the court

_____

[1]All statutory references are to the Penal Code unless otherwise stated.

abused its discretion by allowing a gang expert to discuss hearsay reports of appellant's prior in-custody conduct; (3) the court violated his Sixth Amendment right to confront witnesses by allowing a gang expert to discuss testimonial hearsay evidence underlying his opinion (*Crawford v. Washington* (2004) 541 U.S. 36, 59)[2]; and (4) the court abused its discretion by failing to grant his counsel additional time to investigate and present a new trial motion.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  *July 23, 2013 Assault and Related Crimes*[3]

The Ventura County Hall of Justice has a holding facility for inmates with court appearances.  Large cells house groups of inmates and small cells called "Condos," hold inmates who must be segregated from others.  Condo C of the facility faces Cell 13, on the opposite side of a central corridor, which provides access to the cells and condos.  The occupants of Cell 13 and Condo C can see each other.

On July 23, 2013, Ventura County Sheriff's Deputy Hernandez placed appellant in Condo C, alone.[4]  Cell 13 held about 30 inmates, including Ronald Amesquita, a member of the Southside Chiques gang, and Colonia Chiques members Alexis Sandoval and Frederico Zapien.  Appellant belongs to the Colonia Chiques, also.

Immediately after appellant was placed in Condo C, another inmate, Ernesto Duran, walked by Condo C and entered Cell 13.  Duran sat on a bench along the

---

[2] Appellant recognizes that that existing law does not support his Confrontation Clause claim.  (*People v. Gardeley* (1996) 14 Cal.4th 605, 619.)  He raises the claim because the California Supreme Court is now considering whether a defendant's Sixth Amendment right to confrontation is violated by a gang expert's reliance on testimonial hearsay.  (See *People v. Sanchez* (2014) 223 Cal.App.4th 1, review granted May 14, 2014, S216681; see also *People v. Archuleta* (2014) 225 Cal.App.4th 527, review granted June 11, 2014, S218640 [briefing deferred pending consideration and disposition of *Sanchez*.)

[3] Unless otherwise indicated, the events described herein occurred in 2013.

[4] The officers referenced herein are members of the Ventura County Sheriff's Department.

2

wall on the right side of Cell 13. Duran, a former member of Colonia Chiques, stopped associating with them before July 23. After Duran entered Cell 13, Amesquita approached the front of the cell, facing appellant's cell. He looked back, toward a bench where Duran sat, before he looked toward appellant's cell, and used hand gestures which spelled "Okay," and "Wait."[5]

Amesquita walked away from the front of the cell, to a bench in the middle section of Cell 13, across from Duran, and kept looking toward appellant's cell. Amesquita spoke to Duran and gestured toward appellant's cell. Duran stood, shook Amesquita's hand, walked to the front of the cell, and looked toward appellant's cell. Duran nodded, as if he were acknowledging someone, pointed at himself and returned to his seat. Amesquita remained seated and continued gesturing toward appellant's cell as if they were conversing. Amesquita also looked toward Duran, before looking toward appellant's cell and pointing at Duran. Amesquita signed "That vato on," and subsequently signed "That foo that tat," which means something like that fool with tattoos. Duran had extensive visible tattoos on his arms.

Amesquita moved to the left side of the cell where Zapien and Sandoval sat. Zapien and Sandoval then approached the front of their cell and looked at appellant's cell. Sandoval signed, "What's up? Zapien and Sandoval both turned, looked toward Duran, then looked back toward appellant's cell. Duran fidgeted and moved a paper that he held in his hand. Sandoval looked toward Amesquita. Amesquita joined him, looked at appellant's cell, and turned as if he were whispering in Sandoval's ear. Sandoval and Amesquita both faced appellant's cell. While pointing toward Duran, Amesquita signed, "The fool that tat up?"

Amesquita, Sandoval and Zapien simultaneously walked toward Duran. Zapien stood to the left of Duran, Sandoval stood in front of him; and Amesquita stood to

---

[5] Filiberto Cardenas, a former long-term Colonia Chiques member, testified that he served as a Sureno (foot soldier) for the Mexican Mafia while he was incarcerated. During trial, Cardenas translated the hand signs of inmates depicted in the July 23 video surveillance tape of Cell 13.

Duran's right. Sandoval lunged at Duran. Amesquita and Zapien quickly joined in the assault. While punching Duran, they moved the fight to the right rear corner of the cell. Other inmates joined in the attack, including Alex Garcia, Juan Ledezma and Antonio Chavez. Garcia looked at appellant's cell before he started punching Duran. The fight ended when deputies entered Cell 13.

Erik Raya testified that he was incarcerated in Cell 13 on July 23, and witnessed the fight there. Before the fight began, Raya saw Amesquita, Zapien, and Sandoval, in Cell 13, communicating with appellant, in Condo 13. All four men were using sign language.

On July 23, sometime after the fight ended, Deputy Gary Morales heard a heated discussion between appellant and Duran. Appellant told Duran, "You're good now. You're okay." Morales opined that appellant was saying that the assault had resolved any preexisting problem between him and Duran. Duran refused to testify at trial.

*B. Gang Evidence*

*1. Colonia Chiques Gang Evidence*

Detective Cody Collet testified as an expert regarding local criminal street gangs in Ventura County. Colonia Chiques is the largest gang in Oxnard, with about 1000 members. It claims a large section of Oxnard as its territory. Its members identify with the Dallas Cowboys and Indianapolis Colts, because of letters in the team names (C, O and L). They often wear clothing with five-point stars and the letter C. Colonia Chiques members display hand signs that form "C," "H," and a five-point star. The gang's primary activities are killing, assaulting victims with deadly weapons (knives or firearms), extortion, and witness dissuasion. Its rivals include Ventura Avenue, Southside Chiques and the 12th Street Locos.

Collet opined that appellant was an active Colonia Chiques member on July 23. He based his opinion on several factors: Appellant was with Colonia Chiques members during multiple police encounters from 2000 through 2003; he acted with other Colonia Chiques members on July 23; he wore Dallas Cowboys attire; and flashed

4

Colonia Chiques gang hand signs. He had several tattoos associated with Colonia Chiques, and acquired them on a continuing basis. Collet also opined that on July 23, Zapien and Sandoval were active members of Colonia Chiques, unlike Duran who formerly associated with Colonia Chiques but was no longer active. Collet opined that Amesquita belonged to the Southside Chiques.

### 2. *Mexican Mafia and Surenos Evidence*

Deputy Jonathan James testified as an expert on the Mexican Mafia and the Surenos. The Mexican Mafia is a large criminal gang with members in state and federal penal institutions in California. Its members use fear, intimidation and violence to control Southern California Hispanic gang members in penal facilities, and on the streets. Its rival, Nuestra Familia, exerts similar control of Northern California Hispanic gang members.

The Mexican Mafia is a multi-level criminal organization. The top tier includes approximately 200-250 documented Mexican Mafia members, known as "Brothers" or "Carnals." The Mexican Mafia recruits second tier foot soldiers called "Surenos," who accept its ideology and "proactively" commit crimes on its behalf. James testified that the third tier consists of gang members called "Southsiders," who also accept Mexican Mafia ideology. Southsiders provide "reactive" support, and would join an ongoing prison riot, rather than initiate a riot. An incarcerated gang member is automatically a Southsider if he belongs to a neighborhood gang such as Colonia Chiques, which pays homage to the Mexican Mafia. Inmates with no gang affiliation are "residents."

Members of rival neighborhood gangs cease their rivalries while incarcerated, provided their respective neighborhood gangs accept Mexican Mafia ideology. Thus, a Surenos leader has authority over Surenos who belong to gangs which rival his neighborhood gang. A Sureno can be "checked" (disciplined) for noncompliance with the leader's orders.

Filiberto Cardenas, a former long-term Colonia Chiques member, testified that he served as a Sureno while he was incarcerated. He testified that Surenos use sign

5

language (hand gestures) to prevent prison authorities from hearing and understanding their communications.  Cardenas learned Surenos signing in 1997.  He and appellant used Surenos signs to communicate with each other, most recently in October or November 2012.

The Mexican Mafia has a strict code of conduct.  Among other things, the code prohibits associating with Black inmates; engaging in homosexual acts and/or sharing a cell with homosexual inmates; and talking with law enforcement.  Organization members or residents who talk to law enforcement are viewed as "rats" or "snitches" who are subject to retaliation.  The code compels Surenos to establish an area of control in jail or prison and attack inmates charged with sexual offenses.

The Mexican Mafia uses Aztec and Mayan symbols, such as the Aztec eagle and a "Kanpol," the Mayan symbol for number 13, which is significant because M is the 13th letter of the alphabet.  A gang member must earn the right to have a Mexican Mafia tattoo, often by committing crimes.

James testified about predicate offenses committed by Surenos.  In November 2012, two Ventura County Jail Sureno inmates committed assaults by means likely to produce great bodily injury.  In February 2012, a Sureno in the California Youth Authority said, "This is for trece" (the Mexican Mafia) as he assaulted a correctional officer.  James also testified that in July 2003, Sureno member Kevin McCarthy committed attempted manslaughter while trying to extort money for the Mexican Mafia, when he was not in custody.

James opined that appellant was an active Sureno.  He cited several factors supporting his opinion, including appellant's ongoing association with Sureno and Mexican Mafia members.  James testified that in May 2001, appellant was stopped with Anthony Villa, a high-ranking Sureno who belonged to Colonia Chiques, and was a Mexican Mafia Associate with extensive Mexican Mafia tattoos.  Appellant also had multiple Mexican Mafia and Surenos tattoos.  In October 2012, he had an Aztec eagle warrior tattoo, which reflected his status as a "good leader" in custody.  In November 2012, he had a new Kanpol (Mayan 13) tattoo on his left arm.  By July 2013, he had

6

another, newer "Mayan 13" tattoo.  His continuing acquisition of new Sureno-related tattoos was significant because it showed his ongoing commitment to the Surenos and the Mexican Mafia.

James testified that he considered other factors as indicia of appellant's Sureno status.  He cited a September 2007 statement appellant made to an officer when asked about his gang affiliation.  Appellant answered, "Surenos, of course."  Making a false claim of Sureno affiliation would subject an inmate to serious retaliation.  James also cited several incidents that occurred while appellant was in custody:  In March 2005, appellant admitted that he attacked another inmate (John Steir) who was charged with a sex crime.  In July 2006, appellant suggested that a homosexual inmate (Gulshan Ahuja) request a transfer to a different section (away from appellant).  In July 2005, appellant struck an inmate (Eric Eaton) who said something that appellant may have perceived as disrespectful.  In August 2005, appellant assaulted an inmate (Michael Kinkaid) to a fight after Kincaid asked why appellant forbade another inmate from loaning something to Kincaid.  In December 2006, appellant helped instigate a riot between Hispanic inmates from southern and northern California.  James testified that appellant's in-custody conduct was typical of an influential "tank boss" who runs a section of a jail or prison and claims to be a high-ranking Sureno.

James further testified that appellant's participation in the July 23 incident showed his Surenos leadership role.  James opined that Zapien, Amesquita, Sandoval, Ledezma, Garcia and Chavez were active Surenos members.  The incident involved members of rival street gangs who supported each other in assaulting Duran.  Before the assault, someone accused Duran of snitching.  Duran in effect denied the accusation by saying, "I have my state paperwork."  James testified that appellant's post-incident statement to Duran, "You're good now, you're okay," showed that appellant considered the assault to be sufficient punishment for snitching.  James opined that only a high level Sureno could make such a statement and the combined circumstances indicated appellant was a Surenos leader.

7

DISCUSSION

*Substantial Evidence*

Appellant contends there is not sufficient evidence to support his convictions. We disagree.

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether there is reasonable and credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Streeter* (2012) 54 Cal.4th 205, 241.) Our review is the same in a prosecution primarily resting upon circumstantial evidence. (*People v. Watkins* (2012) 55 Cal.4th 999, 1020.) We do not reweigh the evidence or reassess the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) We accept the logical inferences that the jury might have drawn from the evidence although we would have concluded otherwise. (*Streeter*, *supra*, at p. 241.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.]" (*Albillar*, *supra*, at p. 60.)

"'Conspiracy requires two or more persons agreeing to commit a crime, along with the commission of an overt act, by at least one of these parties, in furtherance of the conspiracy.' [Citation.]" (*People v. Homick* (2012) 55 Cal.4th 816, 870.) Conspiracy requires the intent to agree, and the intent to commit the underlying substantive crime. An agreement among alleged conspirators is often established by circumstantial evidence. Thus, the existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. Common gang membership may be part of the circumstantial evidence that supports the inference that perpetrators acted as conspirators. (*People v. Superior Court (Quinteros)* (1993) 13 Cal.App.4th 12, 20.)

Aiding and abetting liability requires that the defendant act with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing or

8

encouraging or facilitating the commission of the crime, and that by act or advice he aided promoted, encouraged, or instigated the commission of the crime. (See *People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) Other factors include the defendant's companionship or relationship with the perpetrator and his conduct before and after the offense. (*Ibid.*)

In challenging the sufficiency of the evidence, appellant contends there is "no substantial evidence that [he] was a member of the conspiracy or that he aided and abetted the assault." More specifically, he claims that the only evidence of his status as a "high-ranking, shot-calling Sureno" was "bare speculation by Deputy James that appellant was a tank boss, the influential Sureno who could order other Surenos or Southsiders to attack another inmate." The record belies his claim.

Substantial evidence supports appellant's convictions, independent of James' opinion that appellant is a Surenos leader. The prosecution presented photographs of appellant's tattoos depicting Mayan and Aztec symbols, as well as James' expert testimony that Surenos wear such tattoos. Cardenas, who was a Sureno for many years, testified that appellant was a Sureno. He further testified that he and appellant used Surenos signs to communicate as recently as November or December 2012. The conduct of appellant, Amesquita, Zapien and Sandoval provides additional strong circumstantial evidence from which the jury could infer that appellant instigated and encouraged the assault upon Duran. Raya testified that just before the July 23 fight, Amesquita, Sandoval, and Zapien were communicating with appellant and all four men were using hand signs. The surveillance video depicts Amesquita and Sandoval using Surenos signs as they faced appellant's cell. Amesquita and Sandoval pointed toward the bench where Duran sat while Amesquito used signs to ask if appellant meant that guy with the tattoos. Duran had extensive visible tattoos. Amesquita spoke with Duran immediately before Duran stood, walked to a position facing appellant's cell, gestured toward himself, and returned to his seat on the bench. Zapien, Amesquita and Sandoval gathered together briefly before they approached Duran simultaneously and attacked him. Inmate Garcia, who joined in the attack, did so only after he stood and looked toward appellant's cell.

9

Appellant contends that the trial court abused its discretion by allowing James to discuss five reports regarding appellant's prior in-custody conduct, and thereby violated his rights to due process and a fair trial. We disagree.

*Procedural Background*

Before James provided his opinion regarding appellant's status as a Sureno leader, appellant argued that James should not be allowed to refer to six reports of appellant's prior in-custody conduct. During the ensuing Evidence Code section 402 hearing, James testified about the following six incidents: In March 2005, appellant assaulted an accused sex offender (John Steir). In July 2005, he slapped inmate Eric Eaton, who made a disrespectful statement. In August 2005, appellant assaulted inmate Michael Kinkaid, after Kinkaid questioned appellant's forbidding a third inmate from loaning something to Kinkaid. In July 2006, appellant told Gulshan Ahuja, a homosexual inmate, to request a move from the section in which appellant was housed. In December 2006, appellant took part in a prison riot between southern and northern California Hispanic inmates. In December 2007, appellant used sign language directing one inmate (Perrin) to attack another inmate (Watts); Perrin refused and reported appellant. A fourth inmate (Lehra) offered to attack Perrin for failing to follow appellant's orders.

Appellant argued that the reports of his in-custody conduct were based on unreliable hearsay, which was inadmissible under Evidence Code section 352 because its prejudicial impact outweighed its probative value. The trial court excluded the report of the December 2007 incident because its similarity to the instant case posed a danger the jury might misuse that evidence. The court ruled that James could discuss the other five incidents as bases of his opinion, and indicated it would give cautionary instructions to the jury about the limited use of hearsay evidence. Before James testified about the five in-custody incidents, the court instructed the jury the incidents were "being received not to show you that they are true, but to show you only, if they do, what it is that this witness relied on in forming his opinions." The court gave them such an instruction at

10

four separate times during the presentation of gang expert testimony.

We apply "the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the hearsay nature of the evidence in question." (*People v. Waidla* (2000) 22 Cal.4th 690, 725.) "'[A] trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.) The proper application of the rules of evidence does not violate the federal Constitution. (*People v. Cunningham* (2001) 25 Cal.4th 926, 998; see, e.g., *Dowling v. United States* (1990) 493 U.S. 342.)

The trial court did not abuse its discretion in allowing James to discuss appellant's prior in-custody incidents during his testimony. The in-custody incidents were admitted for a limited purpose–to show jurors the basis for the James' opinion and not to show that the incidents were true. The court took care to instruct the jury of their limited purpose, and did so frequently. We have considered appellant's related claim that evidence of the incidents was unduly prejudicial propensity evidence. The court, however, instructed the jury with CALCRIM No. 1403, that it could "not conclude from this evidence that [appellant] is a person of bad character or that he has a disposition to commit crime." Jurors are presumed to understand and follow the court's instructions. (*People v. Homick* (2012) 55 Cal.4th 816, 867.)[6] Moreover, based upon the

---

[6] Appellant asserts that the expert testimony instruction (CALCRIM No. 332) which directed jurors to "decide whether information on which the expert relied was true and accurate" conflicted with the court's cautionary instructions that the reports of incidents upon which the expert relied were not received to show jurors that they were true. Under the circumstances of this case, we disagree. The court instructed the jury with CALCRIM No. 332 once, before deliberations began, along with several other instructions, including CALCRIM No. 303. CALCRIM No. 303 states: "During trial certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and no other." The court instructed jurors five times during the presentation of expert testimony that the reports or incidents the experts discussed were not being received to show jurors that they were true, but only to show them the material upon which the witness had relied in forming his opinion.

11

overwhelming evidence of appellant's guilt, any error in the challenged rulings was harmless. (*Chapman v. California* (1967) 386 U.S 18, 24.)

*Confrontation Clause Claim*

Appellant contends that the trial court violated his Sixth Amendment right to confrontation when it permitted Deputy James to discuss testimonial evidence underlying his opinion. We disagree.

An expert witness testifying regarding criminal street gangs may base his opinion upon conversations with gang members, information gathered by other law enforcement officers, his own personal investigations, or other information. (*People v. Gardeley*, *supra*, 14 Cal.4th at p. 620.) Citing *Crawford v. Washington*, *supra*, 541 U.S. 36, appellant argues that expert testimony regarding such evidence violates the Confrontation Clause. We rejected a comparable argument in *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1427. "Hearsay in support of expert opinion is simply not the sort of testimonial hearsay the use of which [*Crawford v. Washington*, *supra*, 541 U.S. 36 and progeny] condemn[.]" (*Ibid.*) James' reliance on the out-of-court interviews and information gathered by other law enforcement officers who investigated appellant's prior in-custody conduct did not violate his confrontation rights.

*New Trial Motion*

Appellant contends that the trial court abused its discretion and deprived him of due process by failing to allow counsel additional time to investigate and present a motion for new trial. We disagree.

The trial court may grant a continuance only upon a showing of good cause. (§ 1050, subd. (e); *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1181.) On review, we decide whether the trial court abused its discretion by denying the requested continuance. (*Ibid*.) "Good cause" requires a showing that counsel has prepared with due diligence. (*People v. Doolin* (2009) 45 Cal.4th 390, 450.) Not every denial of a request for more time denies due process of law, even if the party seeking the continuance thereby fails to offer evidence. (*People v. Beames* (2007) 40 Cal.4th 907, 921.)

12

The party challenging a ruling regarding a continuance request bears the burden of establishing an abuse of discretion. (*People v. Hajek and Vo*, *supra*, 58 Cal.4th at p. 1181.) An abuse of discretion is established only if the court's decision is arbitrary or unreasonable. (*Id*. at pp. 1180-1181.)

*Relevant Background*

On December 6, 2013, the jury returned its verdicts convicting appellant. The court granted a defense request to set a sentencing hearing for January 22, 2014. By December 13, 2013, appellant had retained the office of private counsel Mark Bledstein. On January 7, 2014, Bledstein contacted appointed trial counsel, Ken Wiksell, regarding his substitution as appellant's counsel. Bledstein placed the matter on the January 16, 2014, calendar to request permission to substitute in as appellant's counsel.

Bledstein did not appear at the January 16 hearing. His associate, Adam Koppekin, appeared and advised the court that Bledstein's office would not be ready for the January 22 sentencing hearing. Koppekin requested a continuance to the "last possible date" before the trial court's pending retirement. He could not provide an answer when the court asked why the office had "frittered away" a month following its retention before seeking to substitute in as counsel and obtain a continuance. The court granted Bledstein's motion to substitute in, but denied his request for a continuance.

Bledstein appeared on the scheduled January 22 sentencing date and submitted motions to continue the matter and strike five prior felony strike convictions for purposes of sentencing, pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497. Bledstein stated he had not yet ordered the trial transcripts from the reporter, and estimated he would need 60 or 90 days before sentencing proceedings. The court questioned his failure to order the transcripts earlier and stated his shortage of time was "self-inflicted." The court indicated it had ordered the court reporter to expedite the transcription and the transcripts could be ready by February 10. Bledstein requested a continuance to a date in early March. The court granted a continuance of 33 additional days, to February 24, 2014, one day before its final day on the bench.

13

On February 20, 2014, Bledstein filed a motion for new trial, claiming that trial counsel failed to provide appellant competent representation because he did not consult a gang expert to rebut the prosecution gang expert's opinion. The motion stated that Bledstein had "contacted a gang expert, Mr. Martin Flores, who expressed a different opinion regarding an interpretation of the events that transpired during this brawl." The motion did not include any supporting declaration.

On February 24, the court heard argument on the new trial motion. Bledstein argued that he did not "believe prior counsel consulted any expert witnesses." Bledstein represented that he had personally contacted Flores, a gang expert witness, who expressed a contrary opinion to that of the prosecution expert. While describing Flores' opinion, Bledstein said, "this is something I could have probably put together a little better had I had a little more time." Citing the absence of any supporting declarations, the trial court concluded there was no showing that trial counsel did not consult a gang expert, and it denied the new trial motion. During a subsequent discussion of the *Romero* motion, Bledstein stated, "[G]oing back to my motion for a new trial, . . . if the court wants to give me another month, I will get the gang expert. I will have him read the transcript and put together a better motion." He stated that he did not "know exactly what" his gang expert would say, and he only knew what he thought the expert was going to say. The court denied the request for additional time and subsequently denied the *Romero* motion.

Appellant has failed to establish that the trial court abused its discretion in denying his request for a additional time to investigate and present his new trial motion. (*People v. Hajek and Vo*, *supra*, 58 Cal.4th at p. 1181.) His February 20 new trial motion claimed trial counsel was ineffective because he failed to consult with a gang expert to rebut the opinion of the prosecution expert. That motion lacked any supporting declaration, or even a statement that current counsel had asked trial counsel whether he consulted with a gang expert. The court did not act unreasonably or arbitrarily in denying the request for additional time to investigate and present the new trial motion.

14

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

15

James P. Cloninger, Judge

Superior Court County of Ventura

_____

Sylvia Whatley Beckham, under appointment by the Court of
Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief
Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General,
Margaret E. Maxwell, Supervising Deputy Attorney General, Yun K. Lee,
Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.